

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### WACO DIVISION

---

YOLANDA SALDIVAR

Petitioner

v.

W11CA058

RICK THALER

Director of The Texas Department of

Criminal Justice Institutional Division

---

MEMORANDUM IN SUPPORT OF

PETITION FOR A FEDERAL WRIT OF

HABEAS CORPUS BY A

PERSON IN STATE CUSTODY

---

Yolanda Saldivar

TDC #733126

Mountain View Unit

2305 Ransom Rd.

Gatesville, Texas

76528

## PARTIES

Petitioner -- Yolanda Saldivar

Respondent -- Rick Thaler

Director, Texas Department of

Criminal Justice Institutional Division

Warden Black

Warden, Mountian View Unit

Warden Forrester

Asst. Warden, Mountain View Unit

Ms. Cheryl Lawson

Administrator, Huntsville, Texas

i

## TABLE OF CONTENTS

| NAME | PAGE |
|------|------|
| Parties | i |
| Table of Contents | ii-iii |
| Index of Authorities | iv-vi |
| Constitution and Statutes | vii |
| Procedural History, Facts of Criminal Case, and Jurisdiction | viii |
| Oral Argument and Statement | ix |
| Facts of the Case | 1-22 |
| Applicable Law | 23 |
| Standard of Judicial Review | 23 |
| Due Process of Law | 25 |
| Ground for Review No. 1 | 27-48 |

Ground for Review No. 1

Prison Officials violated Petitioner's "liberty interest"
protected by Federal Established Law under the Fifth and
Fourteenth Amendment of the United States Constitution and
Texas Constitution by imposing an unmeritted disciplinary
action against Petitioner resulting in lost of privileges
and property. Petitioner was under the direction of TDCJ
official designee's, i.e. Lt. Bailey, decision making
and policy change.

Ground for Review No. 2

49-53

Prison officials violated Petitioner's acquired personal
property rights that is protected by Federal Established
Law under the Fifth and Fourteenth Amendment of the United
States Constitution and Texas Constitution. Petitioner
was restraint from the freedom of property by removing all
of her printing aparatus, i.e. typewriter and pens, from
her possession, interfering and prohibiting her from
completing her appellate post-conviction agenda in state
court through the court system.

## TABLE OF CONTENTS

**NAME**                                                                          **PAGE**

Ground for Review No. 3                                                           54-69

    Prison officials subjected Petitioner to endure cruel
and unusual punishment by placing her on restrictions
causing unnecessary and wanton infliction of pain
prohibited by Federal Established Law under the Eighth
Amendment of the United States Constitution.  Petitioner
suffered undue circumstances such as medical problems,
heat exhaustion, eating and drinking without utensils,
harrassment and oppression

Conclusion, Prayer and Relief                                                     69

Certificate of Service                                                            69

Exhibits:

    A through Z

    AA through ZZ

    AAA through EEE

## INDEX OF AUTHORITIES

| CASE NAME | PAGE |
|---|---|
| Anthony v. State, 209 S.W. 3d 296 | 42 |
| Battle v. Barton, 970 F.2d 779, 782 (11th Cir. 1992) | 36 |
| Blackburn v. City of Marshall 42 F.3d 925 | 52 |
| Blount v. Metropolitan Life Ins. Co. 677 S.W. 2d 565 | 24 |
| Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) | 51 |
| Brewer v. Collins, 857 S.W. 2d 819, 823 (Tex.App. Houston [1st Dist] 1993 no pet.) | 49 |
| Brown v. Nations Bank Corp, 188 F.3d 579 (1999) | 40 |
| Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) | 61 |
| Coleman v. Dretke, 395 F.3d 216 (5th Cir. 2004) | 25,34 |
| Continental Cas v. Functional Restoration, 964 S.W.2d 776 | 24 |
| Dallas Co. v. Gonzales, 183 S.W. 3d 94 (Tx.App.--Dallas 2004) | 26 |
| Estelle v. Gamble, 429 U.S. 97, 104 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) | 59-61 |
| Fire Dept. of City of Fort Worth v. City of Fort Worth, 217 S.W. 2d 664, 147 Tex. 505 | 25 |
| Ford Motor Co. v. tyson, 943 S.W. 2d 527 | 42 |
| Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2009, 2935, 49 L.Ed.2d 859 (1976) | 59,61 |
| Harris Co. Hosp. Dist. v. Shalala, 64 F.3d 220 | 43 |
| Harris v. Angelina County, Tex 31 F.3d 331 | 58 |
| Hartford Cas Ins Co v. State, 159 S.W. 3d 212 | 41 |
| Hewitt v. Helms, 103 S.Ct. 864, 459 U.S. 460, 74 L.Ed.2d 675 on remand 112 F.2d 48 | 33,38 |

## INDEX OF AUTHORITIES

CASE NAME                                                                                PAGE

Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct.                                              61
    2565, 2570, 57 L.Ed.2d 522 (1978)

Kentucky Dept. of Corr. v. Thompson, 109 S.Ct. 1904,                                     33,50
    490 U.S. 454, 104 L.Ed.2d 506 in remand 882
    F.2d 217 (1989)

Kinzie v. Dallas Co. Hosp. Dist., 239 F.Supp 2d 618                                       40

Lewis v. Woods, 848 F.2d 649, 651                                                         30

Madison v. Parker, 104 F.3d 765, 767                                                      30
    (5th Cir. 1997)

Matthews v. Eldridge, 424 U.S. 318, 335, 96 S.Ct.                                         48
    893, 903, 47 L.Ed.2d 18 (1976)

Memphis Light Gas and Water Division v. Craft, 436 U.S.                                   50
    1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978)

Montex-South San Antonio I.S.D., 817 F.2d 1174                                            53

Moody v. Miller, 864 F.2d 1178, 1181                                                      36
    (5th Cir. 1989)

Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct.                                          35
    2593, 33 L.Ed.2d 484 (1972)

National Propane Gas Ass'n v. U.S. Dept. of Transp.                                       25
    42 F.Supp. 2d 665

Nettles v. Griffith, F.Supp. 136                                                         25,34

North Georgia Finishing Inc. v. Dichem, Inc., 419 U.S.                                    50
    601, 608, 95 S.Ct. 719, 723 42 L.Ed.2d 757 (1975)

Pierce v. Texas Racing Com'n, 212 S.W. 3d 745                                             38

Reimer v. Smith, 663 F.2d 1316                                                            53

Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct.                                           60
    2392, 2399, 69 L.Ed.2d 59 (1981)

Salazar-Regino v. Trominski, 415 F.3d 436 (2005)                                          39

Samaad v. City of Dallas, 733 F.Supp. 239                                                 51
    (N.D. Tex. 1990)

Sanders v. State Dept. of Public Welfare, 472 S.W. 2d 179                                 31

# INDEX OF AUTHORITIES

| CASE NAME | PAGE |
|---|---|
| Sandin v. Conner, 515 U.S. 472, 485 (1995) | 25,29,50 |
| Smith v. Rabalais, 659 F.2d 539, 542 (5th Cir. 1981) | 34 |
| Smith v. Travis Co. Educ. Dist., 791 F.Supp. 1170 (W.D. Tx. 1992) | 50 |
| State Bar of Texas v. Tinning, 875 S.W. 2d 403 | 31 |
| Spicer v. Collins, 9 f.Supp. 2d 673 | 25,34 |
| Texas Alcoholic Beverage Com'n v. Winess of Germany and World Inc., 697 S.W. 2d 817 | 40 |
| Thomas v.d Pankley, 837 S.W. 2d 826 | 38 |
| Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) | 25 |
| Whitley v. Albers, 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 84 L.Ed.2d 251 (1986) | 26,58,64 |
| Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) | 24,33-37, 52 |

## ADDITIONAL CASE LAW

| | |
|---|---|
| Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999) | 63 |
| Carey v. Piphus, 435 U.S. 247, 263-64 | 67 |
| Monroe v. Pape, 365 U.S. 167, 184 (1961 | 66 |
| Montez v. South San Antonio I.S.D., 817 F.2d 1174 | 53 |
| Reimer v. Smith, 663 F.2d 1316 | 53 |
| Smith v. Wade, 461 U.S. 30 (1983) | 67 |
| U.S. v. Classic, 313 U.S. 299, 325-26 (1946) | 66 |
| Wade v. Kane, E.D. Pa 1978, 448 F.Supp. 678 | 53 |
| Walker v. Bates, CA 2 (N.Y.) 1994, 23 F.3d 652 | 37 |
| Young v. Quinlan, 960 F.2d 351-61 (C.A. 3, 1992) | 63 |

## CONSTITUTION AND STATUTES

| NAME | PAGE |
|------|------|
| United States Constitution | |
|     Fifth Amendment | 24,27,40 |
| | 42,49 |
|     Eighth Amendment | 41,54,58 |
| | 61-62 |
|     Fourteenth Amendment | 24,25,27, |
| | 30,34,41, |
| | 42,49,50,52 |
| | |
| 28 U.S.C. §2254(b)(1)(B)(i)(ii) | 23 |
| 5 U.S.C. § 706(2)(A) | 24-25,43 |
| | |
| Government Code §501.008(2) | 23 |
| §2001.174 | 24,41 |
| | |
| Texas Rules of Appellate Procedure | |
|     Rule 53 | 28 |
|     53.7(a)(2) | 28 |
| | |
| Vernon Texas Code Annotated | |
|     Civil Practice and Remedies §14.005(a) | 23 |
|     Constitution Statute Art. 6252-13(a) §19(e)(2) | 38,40 |
|     State Constitution Art. I §19 | 24-25,41 |
|     State Constitution Art. II §1 | 25 |
| | |
| Texas Department of Criminal Justice | |
|     ACT-040 | 5,46 |
|     Ad. Seg. IV(E)(c) | 31 |
|     Disciplinary Property Restriction Form 1-0047(B)(7) | 4,8,10,11, |
| | 13,14,50, |
| | 52,53,57 |
|     1-217 | 4 |
|     Disciplinary Rules §III(A)(1) | 9 |
|     (A)(4) | 9,37 |
|     (A)(5) | 9 |
|     § IV(D)(2) | 9 |
|     Forms I-60 | 1,2,27, |
| | 44,45 |
|     1-185 | 17,46-48 |
|     1-186 | 17,46-48 |
|     Property Form Prop-05 | 17-18 |
|     Offender Orientation Handbook Chapter 4 II(B)(2) | 56 |
|     Disciplinary Rule 16(a) | 45,46 |

PROCEDURAL HISTORY,

FACTS OF CRIMINAL CASE,

AND JURISDICTION

Petitioner was indicted by the Nueces County Grand Jury of First Degree Murder in the 214th Judicial District Court, Honorable Judge Mike Westergren, Cause No. 95-CR-1187-F, however, in a change of venue, in the 228th Judicial District Court, Harris County, Cause No. 704424. Petitioner entered a plea of not guilty to the charges. The jury found Petitioner guilty of first degree murder and assessed punishment to life in the Texas Department of Criminal Justice Institutional Division.

After filing a timely Motion for a New Trial and denied, a timely filed Direct Appeal filed in the 14th Court of Appeals in March 1997. The conviction affirmed on October 1, 1998. Motion for rehearing timely filed and denied in December 10, 1998. A Petitioner for Discretionary Review timely fied on March 17, 1999 and denied on August 18, 1999. A Writ of Habeas Corpus prepared and filed on September 20, 2000 in 214th Judicial District Court. It was filed in the wrong convicted court and therefore, the 214th Court refused to take action upon it. Petitioner unaware of this error, allowed time to pass, and the time to file a 2254 Federal writ for Habeas Corpus had passed. Petitioner filed a Pro se State Writ of Habeas Corpus on January 4, 2010 in the Court of Criminal Appeals and was denied on March 17, 2010. Petitioner filed a Motion for rehearing on March 29, 2010 and denied on March 31, 2010. Petitioner filed a Petition for Review to the Supreme Court of Texas on May 12, 2010 and is pending at this time. Because Petitioner resides at the Mountain View Unit in Gatesville, Texas that filing the present Federal Writ of Habeas Corpus falls within the jurisdiction in the Western District Court, Waco Division.

## ORAL ARGUMENT AND STATEMENT

Petitioner asserts and presents to this Court evidence of the facts of the abuse of power, harrassment, and oppression of prison officials upon her by imposing 2 unmeritted disciplinary punishments.  The evidence does not support such actions.  Petitioner had to endure unnecessary pain, suffering, and was deprived of the basic human needs needed to survive especially in a prison setting.  Prison rules, regulations, and policies were ignored and/or abused as prison officials implemented them in a way that was unfair and unjustified.

## FACTS OF THE CASE

The Mountain View Unit houses five protective custody inmates. Their activity plan falls within the administrative segregation plan under the leadership designee Sgt. Bailey, recently promoted to Lt. Bailey, assigned by Warden Black.

On June 11, 2009, Lt. Bailey ordered for all "P.C."(protective custody) inmates to be in compliance of their cells because they would be taken to a meeting in her office in "Ad.Seg."(Administrative Segregation). "TDCJ" (Texas Department of Criminal Justice) records will show this meeting took place at such date and time. The duty officer for Ad.Seg. was Officer Maragh who was present at the meeting. Also present were Property Officer Ms. Ruiz, Lt. Bailey herself and inmates Zamora, Trump, Trenor, Smith and Petitioner. (See Exhibit A - a copy of statements from inmates Zamora and Trump regarding the June 11, 2009 meeting with Lt. Bailey) Among the issues discussed was the appropriate procedure for which P.C. inmates could send home excess property. A primary concern was that Ms. Ruiz, who is responsible for confiscating such property to be sent home, was taking weeks and sometimes months to pick up property. This created a hardship on the inmates because there is only limited space in the small lockbox for which to store food, hygienes, clothes, and other various property items. It became a huge compliance problem and many complaints were being made against the property officer. This resulted in an independent decision from Lt. Bailey to allow P.C. inmates to leave items for confiscation outside the lockbox at the foot of the bed so long as a form requesting confiscation had already been sent to Ms. Ruiz. Even once an I-60 form had been dropped to Ms. Ruiz, she continued to take months to pick up items to be sent home.

Lt. Bailey held a position that gave her great latitude of discretion

for making rule and policy changes. P.C. inmates repeatedly asked Lt. Bailey to put these changes in writing on an "I.O.C." (Inter-Office Communication) sheet so that all would abide by these rules, officers and inmates alike. Lt. Bailey repeatedly neglected to do this. After this meeting and in the coming months, Petitioner periodically left out items to be confiscated by Ms. Ruiz after dropping an I-60 form in the mail to her. TDCJ records will support this and Petitioner did this without any disciplinary repercussions. The most recent of these occasions occurred on March 18, 2010. On that day, the following took place:

> "Lt. Bailey called the duty officer in E dorm, Ms. Keller, to inform her that all PC inmates were to get their cells in compliance so that their cells could be searched. At approximately 10:00 A.M. Lt. Bailey arrived in E dorm and 4 P.C. inmates were taken to the dayroom to speak with her (the 5th P.C. inmate left on pastoral visit). While we spoke with Lt. Bailey, Ms. Keller began searching cells. When she arrived at Petitioner's cell, she noticed items out of Petitioner's lockbox that were in excess. Ms. Keller called Petitioner to explain why these items had not been stored inside the lockbox. Before Petitioner could answer, Lt. Bailey asked Petitioner if those items were for Ms. Ruiz to pick up and confiscate. Petitioner answered the affirmative "yes" so Lt. Bailey asked that the items be brought for her to confiscate herself since she was already in the process of confiscating items and was also going to confiscate a package for Inmate Trenor to send home through visitation. Petitioner did as she was told to do. She gave Lt. Bailey a large brown bag of items. TDCJ records will show this to be true. The bag of items was confiscated and sent to the visitation room for Petitioner's family to pick up when they visited again. Items were picked up on April 2, 2010 when Petitioner's family visited. No disciplinary cases were written for either Petitioner or for Inmate Trenor because all was done per the procedure prescribed by Lt. Bailey on June 11, 2009."

### APRIL 16, 2010

It is at this point that the present issues brought in a Federal Writ of Habeas Corpus begins. On this date, at approximately 8:30 A.M. Petitioner was taken to the medical building for a medical appointment. While she was away, Officer Shands began to search Petitioner's cell. Officer Shands was not the E dorm duty officer but was only temporarily in the dorm with duty

officer Ms. Walker. Upon searching, Ms. Shands removed 4 books, 3 writ size envelopes of leagl material and a brand new pair of panties that Petitioner had left outside the lockbox to be picked up by Property Officer Ruiz. Petitioner was excercising the same process that Lt. Bailey had approved that had also recently been used March 18, 2010 with Officer Keller in Lt. Bailey's presence. The difference here is that Officer Shands proceeded to write Petitioner a disciplinary case charging her with TDCJ rule violations Code 16 and 35, and the case reads as follows:

> "...Offender Saldivar, Yolanda, TDCJ-ID No. 733126, did possess contraband, namely 8 panties, which is in excess of the amount authorized, such amount being 7 panties. Furthermore, Offender Saldivar did have 4 books in a manner that is not authorized, this being at the foot of the bed," (See Exhibit B - a copy of the disciplinary case by Ms. Shands).

Petitioner's items were confiscated and sent to the property room to be packaged for Petitioner's family to pick up. They did so on May 20, 2010 (See Exhibit C - a copy of the Disposition of Confiscated Offender Property).

Petitioner fruitlessly tried to explain to Officer Shands and Officer Walker that she was allowed by Lt. Bailey to leave items out to be confiscated once she dropped a form to Ms. Ruiz. Ms. Shands would not listen to Petitioner about this. When Ms. Shands brought the confiscation sheet out for Petitioner to sign, Petitioner noticed that her legal material was not also being sent to visitation and asked why. If all items being taken were being confiscated as contraband for being improperly stored, then why were the legal papers not also being confiscated? When asked, Ms. Shands replied, "I don't take legal stuff." Petitioner also noticed that Ms. Shands has taken an old pair of panties and left her with the new ones that she had left out to send home. Petitioner tried to explain to Ms. Shands that the extra panties were left out to be sent home as well because she had bought them in the wrong size on April 12, 2010 from the unit commissary (See Exhibit D - a copy of the receipt

3

from unit commissary where Petitioner bought panties, including size). Ms. Shands again refused to listen. Ms. Walker decided to call Lt. Bailey to verify that petitioner had Lt. Bailey's permission to leave said items out for Property Officer Ruiz to pick up. Lt. Bailey denied giving Petitioner any such permission in total contradiction to her decision on June 11, 2009. Petitioner filed a statement with her disciplinary case offense report and also wrote a letter to Lt. bailey describing the incident in greater detail in hopes of an informal resolution. Petitioner never received a response.

## APRIL 20, 2010

Disciplinary case, Code 16 and 35, was graded minor. Petitioner pleaded "Not Guilty" to the charges. Ms. Davidson conducted the notification of the charges (See Exhibit B - Notice by Ms. Davidson in the middle of the Offense Report).

## APRIL 25, 2010

Lt. Bragleman held the disciplinary court hearing for Petitioner's minor case. The hearing was held at 7:15 P.M. on a Sunday night making it impossible to call any witnesses such as Lt. Bailey and other officers that work the morning shift. Therefore, Petitioner refused to attend the hearing. Lt. Bragleman assessed punishment at 30 days commissary, 30 days property, and 15 days recreation restrictions (See Exhibit E - a copy of forms 1-217 and 1-0047B from hearing with imposed restrictions at the bottom). All of Petitioner's personal property was inventoried and placed in the property room including all of Petitioner's pens and typewriter which are of importance in this petition (See Exhibit F - a copy of the inventory sheet). Petitioner filed Step 1 grievance appealing the ruling and punishment of the disciplinary case (See Exhibit G - a copy of the Step 1 grievance).

## APRIL 26, 2010

4

Petitioner spoke to Sgt. Guzman (recently promoted to the post of Ad.Seg. Sgt.) who advised Petitoner to allow the grievance process to take its course and to contact Lt. Bailey which Petitioner had already done. She also advised Petitioner that if Lt. Bailey would confirm to her that she had given Petitioner permission to leave items out to be confiscated, then she would take care of the case for Petitioner. Lt. Bailey refused to confirm her decision to Sgt. Guzman.

### APRIL 27, 2010

SCC ("State Classification Committee") hearings are held. Warden Black and Ms. Williams are present with a female representative from Huntsville for the hearing. All recommended that Petitioner remain in protective custody for security reasons. Petitioner tried to explain to all of them about her recent disciplinary case. Warden Black appeared to be unaware that Petitioner had been given any case and the Huntsville representative stated that she was not here to hear any disciplinary complaints but to address status and classification. Petitioner was not allowed any discussion of the matter even though she was asked whether or not she was getting along with staff, had medical condition or recreation.

### MAY 3, 2010

When Petitioner was taking a shower, Officer Coquitt and Officer Bell searched her cell and found a writ size envelope underneath the headrest of Petitioner's mattress. Because the envelope had another inmate's name on it, Officer Coquitt took the envelope to **scan** and **search** the contents. This went against standard policy ATC-040. Petitioner then receives another disciplinary case from Officer Coquitt who accused Petitioner of having contraband and the case reads as follows:

"...Offender Yolanda Saldivar, TDCJ-ID No. 733126 did possess contraband

namely 2 sports drink mixers, 2 sweet mate, and an envelope of paperwork belonging to another offender which is in excess of the amount authorized, such amount being zero because offender is on property restriction," (See Exhibit H – a copy of the disciplinary case).

Petitioner was authorized by the TDCJ Law Library Supervisors, Ms. Russell and Ms. Dudley, to possess legal papers from Inmate Zamora on their legal visit of February 10, 2010. This was a proper exchange of legal material that Petitioner was allowed to have. TDCJ records will show the time and date of the legal visit. This negated the charge of contraband for paperwork belonging to another offender. In regards to the 2 sweet mates and 2 fruit punch mixers, these were not part of the accusations of the officer's statement. The officer stated these items as part of the Code 16 as contraband but her real accusation was that she believed Petitioner to be in possession of another offender's legal papers. Petitioner's legal papers along with 2 sweet mates and 2 fruit punch mixers were confiscated to be sent to the visitation room for Petitioner's family to pick up (See Exhibit I – a copy of the confiscation sheet). Later that day the same accusing officer, Ms. Coquitt, inventoried other items that Petitioner was not allowed to have on property restriction but which were not confiscated with the legal papers, 2 sweet mates, and 2 fruit punch mixers. These extra items included personal socks, headphones, drinking cup, conditioner, folder and organizer. The officer didn't consider these items as contraband, and no disciplinary case was given (See Exhibit J – a copy of the inventoried sheet completed by Ms. Coquitt). It is incomprehensible that certain items are considered contraband (such as the legal papers, sweet mates, and fruit punch mixers) while others are not (such as the headphones, drinking cup, etc.) when all were items left with Petitioner on April 25, 2010. Had a correct and complete inventory of items been accomplished of Petitioner's personal property on such date, the

entire contraband argument would have been unneccessary. All items left

behind were those Petitioner believed she was allowed to have. Petitioner's

Step 1 grievance returned unsuccessful as it reads:

> "Minor disciplinary case 20100228844 has been reviewed. No procedural
> errors were noted. The evidence supported the finding of guilt.  The
> punishment was within the guidelines, therefore, not considered
> excessive. There is no valid reason to overturn this case. Your  cell
> should remain in compliance." (See Exhibit G – Step 1 grievance response).

Petitioner files a Step II grievance (See Exhibit K – a copy of the Step

II grievance).

MAY 4, 2010

Petitoner wrote a letter to Warden Black, Warden Forrester, and  Major

Fuster regarding the legal papers taken from her against TDCJ policy. Later

that day, Officer Munz informed Petitioner that  Lt. Bailey would be returning

her legal papers. At  approximately 8  A.M. Officer Munz handed Petitioner

her legal papers. In addition,  Petitioner also complained to the officers

on duty that since her drinking  cup was confiscated from her on May 3rd,

she had no means of hydrating herself unless she used her hands to drink

water. This was a deprivation of the most basic human need. Petitioner's

family filed a complaint with the Ombudsman in Huntsville concerning this

unfair treatment against Petitioner stemming from her disciplinary case and

punishment given on April 16, 2010 (See Exhibit L – a copy of the letter sent

to the Ombudsman).

MAY 7, 2010

Petitioner's Code 16 case returned back graded minor. Petitioner pleaded

"Not Guilty" to the charges (See Exhibit H). Petitioner's family receives  a

response from the Ombudsman (See Exhibit M – a copy of the letter from the

Ombudsman).

7

## MAY 10, 2010

Petitioner is unable to resolve April 16th and May 3rd minor cases through pleas and letters to Lt. Bailey, who chose not to confirm the earlier permission she had given Petitioner and all PC inmates concerning confiscated property. Feeling betrayed by Lt. Bailey, Petitioner wrote a 3 page letter to Warden Black concerning the incident and its inconsistency with a prior event involving Lt. Bailey that proved an abuse of power and discretion as well as unequal treatment with other offenders. Lt. Bailey had recently overlooked punishment on a major infraction against another inmate for contraband, an illegal item in the inmate's possession that was not sold on the commissary. Lt. Bailey covered up, aided and abetted a potential crime of escape. This is a gross injustice and a threat to the security of the institution that was overlooked due to favoritism. She allowed one inmate to escape a major case investigation yet allowed Petitioner's case to go forward knowing that she herself had given permission and Petitioner was therefore innocent of the charges. The entire incident occurred on July 7, 2009 (See Exhibit N - a copy of the letter to Warden Black).

## MAY 12, 2010

Lt. Bragleman called Officer Crow to ask Petitioner if she would be attending her minor disciplinary hearing. Petitioner answered "Yes" but Lt. Bragleman never showed up to perform the hearing.

## MAY 14, 2010

Officer Thomas was told to inform Petitioner that the hearing for her minor case would be soon. Capt. Williams, Lt. Bailey and Sgt. Samick were in attendance. (See Exhibit O - a copy of the imposed punishment at the bottom of the 1-147B form and Offense Report). Captain Williams in holding the minor hearing against Petitioner violated Disciplinary Rules:

Section III(A)(1) states:

> "the hearing officer shall...meet the criteria outlined in section IV.D.2.

Section IV.D.2. (b) and (c) state:
> "The disciplinary hearing officer may not be an employee who:
> (b) ordered the filing of the charges;
> (c) participated in any incident that led to the charges in question.
(See Exhibit P - a copy of the TDCJ policy section III(A)(1) and IV.D.2.)

On May 3, 2010 Ms. Coquitt confiscated a writ envelope with Offender's Zamora's name on it containing legal papers belonging to Zamora. These legal papers were properly exchanged by Ms. Russell and Ms. Dudley at a legal visit on February 10, 2010. When Petitioner tried to explain this process to Ms. Coquitt, she instead called Captain Williams who then ordered Ms. Coquitt to confiscate the writ envelope and legal papers and write Petitioner a disciplinary case. Capt. Williams should not have held the disciplinary hearing because she had ordered the case to be written against TDCJ policy. As discussed earlier, these legal papers were returned back to Petitioner by Lt. Bailey negating the charge of contraband. (See Facts of the case - dated May 4, 2010)

Section III(A)(5) states:

> "...minor disciplinary hearings shall be scheduled within seven days, excluding weekends, and holidays, after the allegedd violation".
> (See Exhibit P)

The alleged violation occurred on May 3, 2010, the disciplinary hearing was held on May 14, 2010, 10 days after the alleged violation occurred in violation of TDCJ policy. No reason was given as to why the delay took place.

Section III(A)(4) states:

> "...In adddition, the offender may make a verbal statement in his defense during the hearing" (See Exhibit P)

This section was violated when Capt. Williams "ONLY" allowed Petitioner to utter 6 words, wrote them down as a complete statement. Petitioner urged on with her statement but was then told to "keep quiet" (a mild version of the offensive word). Even after these violations occurred, Petitioner's

disciplinary case was allowed to go through with excessive restrictions of 30 days commissary, property and recreation. Recreation going beyond the 15 day limit per policy. Sgt. Samick adjusted the daily activity card to reflect the limit but did not change the offense report. Petitioner was notified of the change after the hearing. (See Exhibit O)

While Petitioner was away at her hearing, Officer Thomas searched her cell and yet another inventory sheet was done for items the officer claimed that Petitioner should not have under property restriction despite having been searched twice and items taken and others remain in agreement that Petitioner could have them. (See Exhibit Q - a copy of the inventory sheet) This is the third inventory sheet done apart from Officer Keen and Coquitt. It is obvious that there is confusion among officers in deciding what Petitioner can and cannot have rather by policy. No disciplinary case was given by Ms. Thomas. Indeed, the question remains: Who and What determines what is contraband and whether or not a disciplinary case should be given?

This is a clear abuse of power when procedural errors were dismissed as insignificant, and severe punishment imposed for a minor case of an infraction that held no merit as the issue was resolved when Petitioner's legal papers were returned back to her. It is Petitioner's contentions that this travesty of institutional injustice stems from a letter she wrote Warden Black on May 10, 2010 regarding Lt. Bailey's improprieties of dire consequences.

## MAY 17, 2010

Petitioner filed a Step I grievance appealing her second minor disciplinary case and hearing. (See Exhibit R - a copy of the Step I grievance) Petitioner also informs Warden Forrester that she is being deprived of a basic human need, i.e. water, during meals. (See Exhibit S - a copy of the I-60 form to Warden Forrester). Petitioner has had to use her hands to eat many times and has gone without a drink at meal time for lack of cups. Petitioner also filed a

Step I grievance against Lt. Bailey for improprieties regarding the hair dye. (See Exhibit T - a copy of the Step I grievance). Petitioner receives a response from Warden Forrester after complaining to her regarding the heat inside and out of E Dorm Building. (See Exhibit U - a copy of the I-60 form and the response from Warden Forrester).

## MAY 18, 2010

Step I grievance on Lt. Bailey's improprieties returned by Ms. Brock indicating it was a redundant and grievance time had expired. (See Exhibit T)

## MAY 19, 2010

Again, Petitioner filed a grievance against Officer Shands for not wearing gloves while serving meals. She had been distributing food such as bread with her bare hands. This, of course, is against TDCJ policy. She also neglected to have the inmate worker clean and mop the floors as coffee and punch stains were spill all over the floor. It took Ms. Davidson on 2nd shift after Ms. Shands had left to clean the spills out. Because of the infestation of ants, roaches, and the like, is the reason Petitioner complained about this. The only concern of Ms. Shands expressed to Ms. Davidson when leaving her post, was that Petitioner had a night lamp which she should not have being on property restriction but stated to Ms. Davidson, "I don't give a shit, if others don't do their job correctly by inventoring her property as it should be, then I'm not going to worry about it". According to policy form I-0047B, Petitioner had the privilege to that night lamp. This is a form of oppression that goes on in this institution. (This grievance was returned back by Ms. Brock indicating Petitioner submitted the grievance in excess on one every 7 days).

## MAY 20, 2010

Petitioner presents yet another example of oppression. Petitioner had a scheduled regular visit at 3:00 p.m. with her family. At around 2:20 p.m. before her visit, Officer Stephens came on duty. Being on property restriction

and temperatures outside rising to 90 degrees, officers had turned on a big fan close to Petitioner's cell to give her ventilation as she is without her fan, and having a persistent rash to her neck that heat was causing an irritation. As Ms. Stephens approached to turn off the fan, Petitioner pleaded with her not to turn it off as she explained her circumstances. At this time, Ms. Stephens did not have a problem with it. At around 2:40 p.m., 2 officers arrived to take Petitioner to her visit. It was at this time that Ms. Stephens turned off the big fan. Petitioner was gone for about 3 hours. When she returned, the building was hot and humid. At around 6 :00 p.m., Ms. Stephens left for a lunch break but Petitioner was unaware she was gone. Officer Temple was present and Petitioner asked him if he could please turn on the fan. He did so graciously. When Ms. Stephens returned, she noticed that the fan was on. In an expression of disgust, she approached Petitioner and said, "You waited until I left to tell the officer to turn on the fan. If you would stay out of trouble, you would have your own fan". Officer Stephens having not worked in E Dorm for many months, was unaware of the circumstances surrounding my disciplinary cases to make such a comment like that. She just passed judgement upon Petitioner in such unjustified way having no knowledge of what had happen. She proceeded to turn off the fan despite the heat.

### MAY 21, 2010

When Officer Morales came to work at 2:20 p.m., Petitioner explained to her the incident with Ms. Stephens on May 20th. Petitioner asked Ms. Morales if she could call Rank to get permission to leave the fan on continuously so the building could be cool giving Petitioner some ventilation. Lt. Bailey gave Ms. Morales an order to leave a note for all officers to leave the fan on all day and night. This note was log in the activity log and in the wall next to the fan close to Petitioner's cell.

12

## MAY 24, 2010

Warden Forrester returned I-60 stating utensils would be provided to Petitioner. But the problem continued day after day. (See **Exhibit S**)

Petitioner then receives response from Step II grievance stating:

"Minor disciplinary case #20100228844 has been reviewed. There was sufficient evidence for the charge and the guilty verdict. All due process requirements were satisfied and the punishment assessed was within agency guidelines. No further action is warranted in this matter". (See **Exhibit K**)

## MAY 26, 2010

Again, Petitioner demonstrates another incident of oppression and harrassment. Officer Shands was once again on duty in E Dorm. She had been working this morning for about 6 hours and not once did she approach Petitioner about her night lamp. The only time she spoke with Petitioner was at 10:00 a.m. during meal time asking her what she wanted to drink. At around noon time, officer Shands approached Petitioner and stated, "Saldivar, I don't think you should have your night lamp as you are on property restriction". Petitioner responded, "I have been on property restriction since April 25th, 92 shifts have come and gone and not one officer has told me I cannot have my lamp night. According to 'Disciplinary Imposed Property Restriction' form 1-0047B section B(7) indicates Petitioner CAN have her night lamp. On May 19 you address this issue with Ms. Davidson and you stated you didn't give a shit about it, so what is your problem now"? But Ms. Shands would not hear none of this. She stated, "I will have to call the property officer Ms. Ruiz to check on that because I believe you should not have it". Ms. Shands was caught off guard that Petitioner would know what she had said and responded, "How do you know what I said to Ms. Davidson? We were over there, and you were over here". Petitioner informed her that Ms. Davidson had inadvertently blurted what Ms. Shands had said when Ms. Davidson also sought to see if Petitioner could have her night lamp. Petitioner showed Ms. Davidson form

1-0047B section (B)(7), afterwards Ms. Davidson concluded Petitioner could have her night lamp. The exchange between Ms. Shands and Petitioner went on and on, until finally Petitioner told Ms. Shands to do as she so wished. But at the end of the her shift, she left without taking Petitioner's night lamp. A clear case of harrassment and oppression.

## MAY 27, 2010

Officer Nash at meal time could not provide Petitioner with something to drink for lack of a drinking cup. Warden Forrester indicated she would remind the kitchen but it continued to be a problem. Ms. Nash stated she would write an IOC so that Petitioner could be provided a cup at the next meal, but this produced nothing.

## MAY 28, 2010

Petitioner again demonstrates another incident of oppression. Officer Lara came on duty in E Dorm, and when she made her rounds, she proceeded to turn off the big fan "away" from where Petitioner was receiving some ventilation. On May 21 Lt. Bailey had ordered the fan to be left on facing Petitioner's cell. When Petitioner asked Ms. Lara the reason why she had turned the fan away from her, she stated, "Lt. Bragelmann told me turn the fan away from you". In not understanding why, Petitioner further asked Ms. Lara, "Was this decision mentioned at shift change to all of the officers too"? Ms. Lara responded, "No, she only told me in a whisper for my ears only". Taken by surprise by Lt. Bragelmann's decision, Petitioner was exposed to heat exhaustion as temperatures exceeded well over 93 degrees. With Alumimum walls in E Dorm, the temperatures rose even higher inside. Lt. Bragelmann had no reason other than to further abuse Petitioner using her authority and power in a malicious way. Petitioner received Step I grievance response on her second disciplinary case stating:

"Minor disciplinary case #20100249414 has been reviewed. No procedural

errors were noted. A minor hearing is a less formal administrative procedure; there is no requirement to call witnesses. No hearing a case within 7 days does not necessitate overturning a case. You were allowed to make a statement. The DHO did not instruct the accusing officer to write this case. The evidence supported the finding. The punishment was within guidelines. There is no valid reason to overturn this case". (See Exhibit R)

## MAY 31, 2010

When serving trays, Officer White could not find a drinking cup for Petitioner to drink. Therefore, she asked Petitioner if she mind using another offender's drinking cup instead. Petitioner wanting a drink, answered "No" and offender Zamora's insert cup was used to provide Petitioner with something to drink. This is prove that Warden Forrester continued to ignore the problem Petitioner had been complaining about.

## JUNE 1, 2010

Petitioner receives her fan, a pair of shorts, and a T-shirt from Officer Ruiz. (See Exhibit V - a copy of the returned items from Mr. Ruiz). Petitioner submitted a Step II grievance for the second disciplinary case. (See Exhibit W - a copy of the Step II grievance). Petitioner files a Step I grievance on Officer Shands. (See Exhibit X - a copy of the Step I grievance).

## JUNE 4, 2010

Petitioner developed the same rash as before on her neck after her visit. It was dry and warm to the touch. Petitioner decided she would monitor the rash for drainage or lesions. (See Exhibit AAA)

## JUNE 7, 2010

The rash on Petitioner's neck persisted and Petitioner drops a form requesting to see the medical doctor. Days later Petitioner refuses medical appointment as the rash completely went away.

## JUNE 18, 2010

Petitioner receives response to Step II grievance on her second disciplinary case stating:

"Minor Disciplinary Case #20100249414 has been reviewed. You were present at the hearing and provided your defense. All due process requirements were satisfied and the punishment assessed was within agency guidelines. Minor hearings are less formal proceedings, which are not governed by major disciplinary procedures, such as the right to call witnesses. No further action is warranted in this matter". (See Exhibit W)

Petitioner also receives response to Step I grievance against Officer

Shands stating:

"Officer Shands did obtain verification regarding possession of your clamp light from the property officer. There is no evidence of harrassment by Officer Shands. In the future, only present one issue per grievance". (See Exhibit X)

### JUNE 22, 2010

Petitioner's family files a complaint to the Ombudsman at Huntsville, Texas regarding the treatment Petitioner has been receiving by TDCJ prison officials. (See Exhibit Y - a copy of the letter from Petitioner's family to the Ombudsman)

### JUNE 23, 2010

Petitioner's family receives response from the Ombudsman. (See Exhibit Z a copy of the letter from the Ombudsman) Petitioner had a contact visit with her family. While away, her cell was not searched. On returning back, first shift could not provide her with the opportunity to use the shower to take a bath. When second shift arrived, Officer Davidson offered her a shower. While taking her shower, Ms. Russell (Supervisor for the Law Library) and co-worker Ms. Dudley, came to do a cell search on Petitioner's cell. Normally, officers on duty or designated officers, would be asked to search a cell or done as a routine duty. For the personnel of the Law Library to do a cell search, either an inmate has a legal box used to store legal material and is assigned by Ms. Russell whereby policy states it can and will be searched randonly OR there is reasonable suspicion that Petitioner has contraband within some legal papers whereby policy states upon completion of forms 1-185 and 1-186 which must be filled out in order to carry out such search,

it can be done.  After filling these forms out, Petitioner MUST be notified of such a search.  Petitioner DOES NOT have a legal box and no 1-185 or 1-186 forms were filled out much less Petitioner notified.  When Petitioner asked Ms. Russell the reason behind this search, she responded, "Why?  Do you have a guilty conscious?  This was a random search".  Petitioner said nothing else.  No other inmate's cell was searched.  Upon returning to her cell, Petitioner noticed that her legal material remained inside her writ envelopes "untouched".  The only items that were scattered were her under-garments, sheets, blankets, books, hygiene items, and trash bag.  All indications that this was not a legal search.  The timing of this cell search was troubling as Petitioner noticed that on that DAY, ALL restrictions would be lifted against her.  It did raise the suspicion that prison officials wanted to find anything that could justify another disciplinary case  to be written against her to further her punishment.

### JUNE 24, 2010

At around 8:00 a.m., Petitioner was asked about taking a shower.  While doing so, Sgt. Guzman came to do her rounds.  While doing so, Petitioner notified Sgt. Guzman about this "random" cell search the day before.  She was surprised by it all stating that no one had informed her as they should have.  She asked Petitioner who had ordered such a search.  Petitioner stated she didn't know.  Sgt. Guzman then told her that she would find out who had ordered such a search and would get back to her.  Later that morning, Sgt. Guzman returns ALL of Petitioner's property while Petitioner WAS IN THE SHOWER. When she was done, she was escorted back to her cell by Ms. Bachstrawn and upon entering, she noticed that her property was laying on the floor.  Sgt. Guzman had left the building by this time.  While checking her property over for some irregularities, Ms. Bachstrawn brought Petitioner form PROP-05 for her to sign.  The form itself states: "ITEMS RETURNED TO OFFENDER (SEE ITEMS

MARKED ABOVE).  It asked for Offender Signature and Date and Staff initials and date of which the officer forgot  to put her initials.  (See Exhibit AA - a copy of all the inventoried sheets)  It took some time for Petitioner to totally check her property out as it was bunched up in several chain bags. When she came to her typewriter, she noticed that the "I" letter was pulled out, the SPACE BAR was lose and pulled out, not in place, the returned key stayed down, and the "A" key stayed down as well.  By this time, Ms. Bachstrawn has just left her shift, and Ms. Seager was doing her preliminary rounds when Petitioner immediately informs her about her typewriter.  Ms. Seager informs Petitioner that she would need to confiscate her typewriter and advises her to file a grievance on it.  (See Exhibit BB - copies of the confiscation sheet and the Step I grievance)  Petitioner did as she was advised to.  Petitioner notices that it was strange that Sgt. Guzman, who is the Ad.Seg. Sgt. not responsible for the pick up and returning of property back to inmates, was delivering her property and not the property officer, Ms. Ruiz.  For 2 months, Petitioner's property including her typewriter were in the possession of Ms. Ruiz and she alone was responsible that nothing happen to any property belonging to inmates.  Petitioner's typewriter was in good working condition on April 25, 2010 when Officer Keen confiscated all of her property after being placed on property restriction.  Officer Keen made this very clear to Petitioner and rank as well.

### JUNE 26, 2010

As Petitioner went to take a shower, Office Mosqueteller went and searched Petitioner's cell and upon doing so, she found that Petitioner's cell was NOT in compliance.  The officer proceeded to take items from Petitioner accusing her of being out of compliance while taking a shower and threaten to write her a disciplinary case.  Petitioner had addressed this issue with Warden Forrester regarding compliance during shower time.  (See Exhibit CC

- a copy of the grievance in Feb. 2010 addressing the issue of compliance while showering)  The Warden stated: "...The only time your cell need not be in compliance is when you are in it, or when you are in the shower..." Officer Mosqueteller stated she didn't care what the Warden had said, if she wanted to tear up Petitioner's cell, she could and would always find something justifying writing a disciplinary case and that she might just do that.  Her demeanor was forceful with an anger tone of voice.  She would not hear a word Petitioner had to say.  She stated she would do whatever she wanted to do.  Its TDCJ policy that officers can search cells at any time BUT to go against the decisions of the Warden is a gross abuse of power.

## JUNE 29, 2010

Petitioner's family informs the Ombudsman that all administrative procedures to resolve the pending issues have been exhausted by Petitioner and would like their assistance on this matter.  (See Exhibit DD - a copy of Petitioner's family letter to the Ombudsman)

## JULY 1, 2010

The Ombudsman response back to Petitioner's family letter.  (See Exhibit EE - a copy of the Ombudsman letter)

## JULY 6, 2010

Captain Williams approached Petitioner who took her out of her cell and spoke with her in the outside recreation yard.  In a very authoritative and intimidating manner asked Petitioner about the letter her family had sent to the Ombudsman on June 22, 2010 regarding prison officials taking all manner of correspondence materials from Petitioner on April 25, 2010 when being placed on property restriction.  Captain Williams being unprepared for this interrogation, asked Petitioner that if she went to her cell right now, would she find "pens" in her cell.  Petitioner informed her that she would definitely find pens as she had all of her property now, that she was no longer on property

restriction.  Captain Williams dismissed this answer, and continued to question Petitioner further.  She asked Petitioner, "Because when you are on property restriction, I can take your typewriter and pens".  Again, Petitioner tried to tell her she was no longer on restriction.  But Captain Williams continued and asked for Petitioner to show her prove that her correspondence materials were taken from her.  She took Petitioner back to her cell and Petitioner pulled out the inventory sheet done on April 25, 2010 where it clearly shows that her correspondence materials were taken from her.  Captain Williams handed the sheet back and left without another word.

### JULY 28, 2010

Petitioner receives a response to the Step I grievance on her typewriter stating:

"There is no evidence to suggest that staff is responsible for any damage to your typewriter.  At no time did staff note any damage prior to issuing it back to you on 6/24/10.  Neither did you notify the staff member that returned it to you of any damage.  No action will be taken. (See Exhibit BB)

### AUGUST 1, 2010

Petitioner files a Step II grievance on her typewriter.  (See Exhibit FF - a copy of the Step II grievance)

### AUGUST 9, 2010

Petitioner's family sends another letter to the Ombudsman informing them about the incident with Captain Williams and the issue with the broken typewriter. (See Exhibit GG - a copy of the letter sent to the Ombudsman by Petitioner's family)

### AUGUST 11, 2010

Petitioner's family receives a response from the Ombudsman.  (See Exhibit HH - a copy of the Ombudsman letter)

### AUGUST 16, 2010

Petitioner receives response from the Step II grievance on her typewriter

stating:

"Your property claim has been investigated by this office. There was no clear evidence found to support your claim that staff was responsible for your alleged property damage. You signed the inventory sheet when your property was returned, indicating that the items listed were correct. In the absence of evidence to support your claim, action from this office is not warranted". (See Exhibit FF)

### AUGUST 26, 2010

Petitioner submits a blue slip request to the commissary department to purchase a typewriter. The request goes to the property officer, Ms. Ruiz, for approval and then sent to the Warden for final approval.

### SEPTEMBER 10, 2010

Petitioner spoke with Ms. Ruiz when she came to her cell to pick some items to be sent home regarding the approval of her blue slip to purchase a typewriter. Ms. Ruiz informs Petitioner that she had seen it and was indeed approved. Unless Petitioner and the commissary department receive that blue slip approval, Petitioner cannot purchase a typewriter.

### SEPTEMBER 28, 2010

Petitioner resubmits a blue slip request to commissary to purchase her typewriter.

### OCTOBER 3, 2010

It is unusual to wait over a month or so for an approval to purchase items in commissary. Petitioner felt that this waiting period was odd and without justification. Ms. Ruiz said it was approved, why not forward it to commissary? Because Petitioner has legal work to do and needed her typewriter to do so, she decided to file a grievance, and did so. (See Exhibit II - a copy of the Step I grievance on the typewriter)

### OCTOBER 6, 2010

Petitioner finally receives her approval for her typewriter. (See Exhibit JJ - a copy of the approval)

## OCTOBER 8, 2010

Petitioner was able to finally purchase her typewriter. (See **Exhibit** **KK** - a copy of the receipt of the purchase of the typewriter)

## APPLICABLE LAW

V.T.C.A. Civil Practice and Remedies §14.005 states:

    (a)  an inmate who files a claim that is subject to the grievance system established under government code §501.008, shall file with the Court:

        (2)  a copy of the written decisions from the grievance system.

28 U.S.C. §2254(b)(1) states:

"an application for a Writ of Habeas Corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that:

    (B)(i)  there is an absence of available state corrective process; or

      (ii)  circumstances exist that render such process ineffective to protect the rights of the Applicant.

Because this case involves a prison disciplinary action, it is not reviewable by the state court and since it involves violations of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, that it is properly brought by Federal Habeas Corpus petition to this Court.  28 U.S.C. §2254(b).

## STANDARD OF JUDICIAL REVIEW

If the law authorizes review of a decision in a contested case under the "substantial evidence rule" or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

    (1)  may affirm the agency decision in whole or in part; and

    (2)  shall reverse and remand the case for further proceeding if substantial rights of the Appellant have been prejudiced because the administration findings, inferences, conclusions, or decisions are:

        (a)  in violation of a constitutional or statutory provision;

        (b)  in excess of the agency's statutory authority;

23

(c) made through unlawful procedure;

(d) affected by other error of law;

(e) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann §2001.174 (Vernon 2000).

Petitioner's substantive rights were prejudiced and constitutional rights violated because TDCJ decisions and findings on her disciplinary cases were in violation of (a)(b)(c),(e), and (f) above as Petitioner will show this Court.

Where vested property rights or constitutional rights are adversely affected by agencies decisions, there is a constitutional right to judicial review as a matter of due process. U.S.C. Amend. 5 and 14; Blount v. Metropolitan Life Ins. Co., 677 S.W. 2d 565. When vested property right is affected by action of an administration agency, affected party has an inherent right to appeal invoking due process of law. V.T.C.A. St. Const. Art. I§19; Continental Cas v. Functional Restoration, 964 S.W. 2d 776. In Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court squarely held that every prisoner retains a significant residuum of constitutionally protected liberty following his incarceration. Though the prisoner's "rights" may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime ...[Prisoners] may not be deprived of life, liberty, or property without due process of law. Id. at 555-556, 94 S.Ct. at 2974. Essential function of Judicial Review of administrative activity under Administrative Procedure Act (APA) is to ensure that the agency engaged in reasoned decision making. 5

24

U.S.C.A. §706(2)(A); National Propane Gas Ass'n v. U.S. Dept. of Transp., 43 F. Supp. 2d 665. An administrative agency, though vested with discretion in its acts, must not exercise its powers arbitrarily and reasonableness of its orders is subject to Judicial Review. Vernon's Ann. St. Const. Art. 2§1; Fire Dept. of City of Fort Worth v. City of Fort Worth, 217 S.W. 2d 664, 147 Tex. 505.

## DUE PROCESS OF LAW

The United States Constitution Equal Protections of the law Fourteenth Amendment extending the provisions of the Fifth Amendment due process clause making them applicable to the State which must guarantee equal protection of its citizens. It states in Section I of the Fourteenth Amendment:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protections of the laws".

The Texas Constitution Art. I§19 states:

"No citizen of this State shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfanchised, except by the due course of the law of the land".

"[p]rison walls do not form a barrier separating prison inmates from the protections of the United States Constitution". Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Prisoners do not shed all constitutional rights at the prison gates. Sandin, 515 U.S. at 485, 115 S.Ct. 2293; Coleman v. Dretke, 395 F.3d 216 (5th Cir. 2004). Prisoners charged with rule violations are entitled to certain due process rights under the Fourteenth Amendment when the disciplinary action may result in sanction that will impose upon "liberty interest". Nettles v. Griffith, F.Supp. 136; Spicer v. Collins, 9 F.Supp. 2d 673. Liberty Interest may arise from two sources, the due process clause itself or state law. Coleman v. Dretke, 395 F.3d 216 (CA5 Tex. 2004).

A constitutionally protected "property" interest for purpose of a due process claim is an individual entitlement grounded in state law, which cannot be removed except for cause; the interest cannot be based on a mere unilateral expectation. Dallas Co. v. Gonzales, 183 S.W. 3d 94 (Tx.App.--Dallas 2004). Constitutional protections accorded to inmates specifically include the Eighth Amendment prohibition against cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 84 L.Ed.2d 251 (1986).

## GROUND FOR REVIEW No. 1

Prison officials violated Petitioner's "liberty interest" protected by Federal Established Law under the Fifth and Fourteenth Amendment of the United States Constitution and Texas Constitution by imposing an unmeritted disciplinary action against Petitioner resulting in lost of privileges and property. Petitioner was under the direction of TDCJ official designee's, i.e. Lt. Bailey, decision making and policy change.

## STATEMENT OF THE CASE

Petitioner received a TDCJ disciplinary case in what Officer Shands indicated Petitioner violated disciplinary rule Code 16 and 35, contraband and excess.  (See Exhibit B)  As punishment she received the maximum allowed according to the guidelines of 30 days commissary, 30 days property, and 15 days recreation restrictions.  Petitioner tried to explained to Officer Shands and Ms. Walker that she had left items out of her storage box pursuant to Lt. Bailey's June 11, 2009 policy change decision giving P.C. inmates the privilege to leave items out of their storage box to be confiscated intended to be sent home as long as they dropped an I-60 form to property officer, Ms. Ruiz.  Petitioner is NOT violating an established TDCJ rule.  Lt. Bailey in making independent decisions, made the determination to change the offender property storage policy at her discretion.

At the time that Petitioner received this disciplinary case by Ms. Shands, she was working on submitting a Petition to the Supreme Court of Texas and offers this Court the following:

"Petitioner filed an original state writ of habeas corpus on January 4, 2010 in the 214th Judicial District Court Honorable Judge Longoria, Nueces County Courthouse, Corpus Christi, Texas.  (See Exhibit LL - a copy of the letter submitting state writ of habeas corpus)

"On February 19, 2010, the State filed an original answer and its proposed findings of fact, conclusions of law and order.  (See Exhibit MM - a

copy of the letter from the State's answer)

On March 17, 2010, Petitioner's state writ of habeas corpus was denied. (See **Exhibit NN** - a copy of the white card from the Court of Criminal Appeals)

Petitioner filed a Motion for Re-hearing on March 29, 2010 and was denied on March 31, 2010. (See **Exhibit OO** - a copy of the return receipt green card filing Motion and white card denial)

According to the Texas Rules of Appellate Procedure Rule 53 - Proceedings in the Supreme Court of Texas - Petitioner had 45 days to file a Petition for Review pursuant to Rule 53.7(a)(2) from the date of the Court of Appeals last ruling on all timely filed motions for rehearing or en banc reconsiderations. From the timely filed Motion for Re-hearing and denial of March 31, 2010, Petitioner had to file a Petition for Review to the Supreme Court of Texas by MAY 14, 2010. Petitioner did so on May 12, 2010 with the help of friends and family because her entire property was taken from her for the unmeritted disciplinary case that jeopardized her filing on time. (See **Exhibit PP** - a copy of the U.S. Postal Service certified mail receipt)

It is crucial for this Court to note that TDCJ prison officials by giving Petitioner maximum punishment for an unmeritted disciplinary case including "property restriction", they removed from her possession the instruments, i.e. "typewriter" and "pens", needed to complete her Petition for Review by the Supreme Court of Texas. Their interference compromised her filing the Petition on time to seek freedom from institutional life which is a prisoner's right to do.

## ARGUMENTS AND AUTHORITIES

According to the Disciplinary Procedure I(A) Reporting Infractions, it states:

"When a TDCJ employee...witnesses or has knowledge of any act by an offender which is in violation of the rules and regulations of the Correctional Institution Division, the employee first will attempt ...to resolve the matter informally" (See **Exhibit QQ** - a copy of the TDCJ policy on Disciplinary Procedures)

Officer Shands neither offered or attempted to resolve the matter with Petitioner informally whatsoever. Informally resolving this issue was appropriate as this did not possess a security risk for anyone or anything. In fact, Ms. Shands would not even speak with Petitioner over the matter.

It was the duty officer, Ms. Walker, who tried to find out about Lt. Bailey's decision of June 11, 2009 by calling Lt. Bailey herself. But Ms. Shands refused to stay and find out, instead left the building, leaving the disciplinary case behind for Ms. Walker to serve and give Petitioner notice. Ms. Walker would not even contemplate second guessing Ms. Shands reasoning behind giving Petitioner this unmeritted disciplinary case. Petitioner attempted to have Ms. Walker reason with her, but Ms. Walker stated it was out of her control.

Petitioner's release and liberty from institutional life, altogether, is a far more significant change in a prisoner's freedom.

"Liberty" interest is independently protected by the Due Process Clause in the United States Constitution. A State may create a "liberty" interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. TDCJ in its enactment of regulations governing the administration of state prisons, have created a "liberty" interest in restraining Petitioner from progressing her appellate agenda, i.e. Petition for Review to the Supreme Court of Texas, in her post-conviction remedies.

The Supreme Court has held:

"[W]e recognize that states may under certain circumstances create liberty interest which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which... impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life". Sandin v. Conner, 515 U.S. 472, 485 (1995).

Petitioner was classified into protective custody status under the administrative segregation plan. This created a restraint from freedom to move about in population and interact with other inmates. This decision was based on Petitioner's criminal case and security not only for Petitioner but also for security of the institution. This was not because of any bad conduct by Petitioner. While this is not the issue at hand, it does create the

atmosphere surrounding the circumstances brought before this Court. Petitioner asserts that she has the freedom to seek appellate review through the Court system and any restraint from this freedom constitutes a violation of Petitioner's constitutional rights. This created a significant hardship on Petitioner as she became dependent on family and friends to assist in the completion of her Petition. Petitioner was not able to ask for inmate assistance as she is confined to a single cell and does not share activities as population inmates. Petitioner will show this Court that her freedom to proceed in state court to file post-conviction remedies was restraint when her manner of printing, i.e. typewriter and pens, were unjustly taken from her pursurant to an unmeritted disciplinary punishment. Petitioner has an interest in her liberty from this institution protected under the United States Constitution and Texas Constitution. "[A] violation of constitutional rights is NEVER de minimis, a phrase meaning so small or trifling that the law takes no count on it". Lewis v. Woods, 848 F.2d 649, 651. When Petitioner is facing a life sentence and is not eligible for parole until after 30 years served flat time, seeking liberty and freedom through the court system is an undertaking of huge porportions and any restraint from doing so should never be considered de minimis when constitutional rights are violated. Identification of a liberty interest that is protected by the Fourteenth Amendment is a question of federal constitutional law and is reviewed de novo. Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997).

Petitioner sets forth Lt. Bailey's role in this petition. Lt. Bailey, acting and performing in the capacity of leadership for all of Ad.Seg. inmates including protective custody, was responsible for the day-to-day activities of each inmate, making decisions governing their status, and applying TDCJ regulations accordingly. Many of her independent decisions on rules and policy changes were NEVER followed by an IOC - Interoffice Communications -

30

sheet which would have directed every TDCJ officer and inmate of any policy changes and their compliance to it. Vagueness of statute, rule, regulation, or order violates due process only when required course of conduct is stated in terms so vague that persons of common intelligence must guess at what is required or when there is substantial risk of miscalculation by those whose acts are subjected to regulation. State Bar of Texas v. Tinning, 875 S.W. 2d 403. Statute or regulation must be definite to be valid and if regulation is incomplete, vague, indefinite, and uncertain and if it forbids doing or an act which is so vague that men of common intelligence must necessarily guess at its meaning and that such men differ as to its application, regulation violates first essential of due process. Sanders v. State Dept. of Public Welfare, 472 S.W. 2d 179. Lt. Bailey's "decision" of June 11, 2009 allowing P.C. inmates to leave items out of their storage boxes to be confiscated by property officer, Ms. Ruiz, was one that P.C. inmates understood. But to the average TDCJ officer, this decision was not clear, was uncertain, vague, incomplete, and indefinite. This caused confusion among all of the TDCJ officers which is indicative for why Officer Shands and Ms. Walker would not listen to Petitioner's explanation that she had Lt. Bailey's permission to leave her items out of her storage box to be confiscated. Instead Petitioner received a disciplinary case, punishment was assessed at maximum imposing atypical and significant hardship on Petitioner as she was stripped of her property and left with only the bare necessities, and placing a hardship in filing her Petition in the Supreme Court. The officers had nothing in writing that would direct them to her decisions. This raised a liberty interest claim for Petitioner.

According to the Ad. Seg. Plan IV E(c), it states:

"Offenders property must be stored in the storage space provided and in accordance with AD 03.72 'Offender Property'. (Petitioner is not privy to a copy of this TDCJ Rule)

31

According to AD 03.72 page 12 of 41 of the Offender Property, it states:

"Any deviation (i.e. storage containers less than 1.75 cubic fee)[as would be required if inmates left items out to be confiscated to be sent home per Lt. Bailey's decision] MUST BE AUTHORIZED through the Regional Director to the appropriate Division Director" (Petitioner is not privy to a copy of that TDCJ Rule)

Petitioner subjected herself and acted upon Lt. Bailey's regulation and policy change regarding TDCJ property storage policy taking a substantial risk that this change was indeed an authorized change. Instead, Petitioner's act of leaving items out of her storage box to be confiscated by Ms. Ruiz was a miscalculation because Lt. Bailey's decision had NO UNDERLYING AUTHORIZATION. This led to Petitioner receiving a unmeritted disciplinary case. Furthermore, this also explains why Lt. Bailey would not support Petitioner in dismissing her disciplinary case.

In Petitioner's Step I grievance, Warden Forrester stated, "...No procedural errors were noted..." (See Exhibit G) In the Step II grievance, Ms. Lawson stated, "...There was sufficient evidence for the charge and the guilty verdict. All due process requirements were satisfied..." In a position of authority, Lt. Bailey was and is allowed to delegate duty and make independent decisions affecting the operation of the Mountain View Unit, Warden Forrester by not accepting Lt. Bailey's decision of June 11, 2009 allowing P.C inmates to leave items out of their storage box to be confiscated, then it stands to reason that Lt. Bailey's leadership and authority deserves serious questioning and an investigation conducted for it is imperative that the administration of this prison be uncompromised in any way, is it not? (See Exhibit K) Lt. Bailey's decision was a procedure she enacted upon or beside an outstanding one. That she would not recognize it and support Petitioner in dismissing her disciplinary case, is a PROCEDURAL ERROR. This was an authorized decision as Warden Forrester NEVER stated the contrary to those affected by it even

though it required the authorization by someone higher than the Warden. The Due Process requirement under Wolff v. McDonnell (c) indicating the opportunity to be heard in person and to present WITNESSES (Lt. Bailey) and documentary evidence (policy change enacted on June 11, 2009) was not satisfied. For Ms. Lawson to decided that the evidence is sufficient to find a prisoner guilty by mere dismissing a due process requirement or requirements is troubling and deserving that this Court overturn this disciplinary case in violation of Petitioner's constitutional rights.

In order to create a protected liberty interest in the prison context, state regulations MUST USE EXPLICITLY MANDATORY LANGUAGE in connection with the establishment of specific substantive predicates to limit official discretion and thereby require that a particular outcome he reached upon a finding that the relevant criteria has been met. Kentucky Dept. of Corr. v. Thompson, 109 S.Ct. 1904, 490 U.S. 454, 109 L.Ed.2d 506 in remand 882 F.2d 217 (1989). Mere fact that state creates careful procedural structure to regulate use of Ad. Seg. does not indicate existence of protected interest, but it is only when this procedural structure is clearly Mandatory that liberty interest arises. Hewitt v. Helms, 103 S.Ct. 864, 459 U.S. 460, 74 L.Ed.2d 675 on remand 112 F.2d 48. It is clear from TDCJ policy on storage capacity (A.D. 03.72) that the language is MANDATORY. In addition, Lt. Bailey had no authorization from the Regional Director or Division Director to add, substract or change standard policy. Moreover, there is no evidence of an Administrative Directive from Warden Black or Forrester through an IOC giving Lt. Bailey any authorization to make an independent decision as to give P.C. inmates permission to leave items outside their storage capacity to be confiscated. BUT had Warden Black or Forrester given Lt. Bailey an Administrative Directive allowing her to make independent decisions in disregard to standard policy (A.D. 03.72), the question is: Why would Lt. Bailey allow such an injustice

33

to be applied upon Petitioner with maximum punishment knowing she was doing exactly what Lt. Bailey had given her permission to do? Petitioner's disciplinary case had NO merit whatsoever. Because TDCJ policy AD 03.72 was mandatory, Petitioner has a legitimate claim to a liberty interest claim.

## I.   GUARANTEED DUE PROCESS RIGHT VIOLATED IN DISCIPLINARY ACTION GIVING RISE TO A LIBERTY INTEREST

Prisoners charged with rule violations are entitled to certain due process rights under the Fourteenth Amendment when the disciplinary action may result in a sanction that will impose upon a liberty interest. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Smith v. Rabalais, 659 F.2d 539, 542 (5th Cir. 1981); Nettles v. Griffith, F.Supp. 136; Spicer v. Collins, 9 F.Supp. 2d 673. It is well documented that Petitioner received severe sanctions especially personal "property" restrictions which raised a liberty interest as Petitioner was in the process of filing a Petition for Review to the Supreme Court of Texas. Solitary confinement, Ad.Seg., and P.C. are all liberty interest and imposing further restrictions such as "personal property" creates an even greater liberty interest when an inmate, such as Petitioner, was working towards freedom from institutional life. Despite the restrictions imposed by incarceration, the Due Process Clause guarantees a prisoner some process before the government can impose conditions that are qualitatively different from the punishment characteristically suffered by a person convicted of a crime, and which have stigmatizing consequences. Coleman v. Dretke, 395 F.3d 216 reh en banc denied, 409 F.3d 665 cert. denied 126 S.Ct. 427, 163 L.Ed.2d 325. Petitioner will show this Court that these guarantees were not accorded to her before conditions were imposed upon her. It must be determined whether the disciplinary procedure in question here was constitutionally sound. To satisfy the requirements of Due Process, a person's disciplinary action must meet criteria minimum

procedural requirements:

   (a)  written notice of the claimed violation;

   (b)  disclosure to the inmate of evidence against him;

   (c)  an opportunity to be heard in person and to present witnesses and

        documentary evidence;

   (d)  the right to confront and cross-examined adverse witnesses, unless

        the hearing officer specifically finds good cause for not allowing

        such confrontation;

   (e)  a neutral and detached hearing body; and

   (f)  a written statement by the fact finders regarding the evidence relied

        on and reasons for the disciplinary action.

**Wolff v. McDonnell**, 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935

(1974); **Morrissey v. Brewer**, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d

484 (1972).

Petitioner complains that she was denied elements (c), (d), and (e).

In her FIRST minor disciplinary hearing, Petitioner refused to attend for

the reasons she sets forth. In calling witnesses and adverse witnesses,

Petitioner would not have succeeded. Lt. Bailey, in a leadership and

administrative position, worked standard hours of Monday through Friday from

8:00 a.m. to 5:00 p.m., off the WEEKENDS. Accusing Officer and adverse witness,

Ms. Shands works from 6:00 a.m. to 2:00 p.m., six days a week on a rotation

schedule. Lt. Bragelmann held the disciplinary hearing for Petitioner's minor

case on April 25, 2010, SUNDAY, at 7:15 p.m. (See Exhibit E) Lt. Bailey was

Petitioner's main witness who could have corroborated that what Petitioner

had done by leaving items outside her storage box to be confiscated was

according to her decision made on June 11, 2009. Adverse witness, Officer

Shands, could have revealed whether or not she was aware of Lt. Bailey's

independent decision change in policy. These two witnesses were not made

available to Petitioner as required in **Wolff**, supra, because the hearing was held at a **time** and **date** that neither one was at work. Petitioner knew that this hearing would not have been a fair hearing. TDCJ prison officials may argue that Petitioner has no right to claim a constitutional violation when she didn't even attend the disciplinary hearing on April 25, 2010. She did so on her second disciplinary hearing on May 14, 2010. In contrast, Petitioner will argue two points: First, Petitioner, as stated earlier, knew that Lt. Bailey and Officer Shands were not on duty at the time and date Lt. Bragelmann decided to hold the hearing. Petitioner would not have been able to call upon any witnesses for their testimony. And Second, attending a disciplinary hearing is not an absolute. Petitioner reasoned that what would be the purpose to attend if it was going to be partisan. The right to attend a disciplinary hearing is an essential due process protection but is not absolute, **Battle v. Barton**, 970 F.2d 779, 782 (11th Cir. 1992), or guaranteed: If a prisoner is unable to or **REFUSES** to attend a disciplinary hearing, due process requires not more than that the hearing be held in accordance with **ALL** of the other **requirements** of due process that are called for under the circumstances. These requirements were discussed earlier in **Wolff**, supra. Due process requires only that the government operate under procedure that gives a person a **fair** opportunity to ensure that the governmental decision affecting that person's life, liberty, or property is just.... **Moody v. Miller**, 864 F.2d 1178, 1181 (5th Cir. 1989). Lt. Bragelmann knew that Petitioner **would not** be able to call her witnesses on a Sunday night at 7:15 p.m. They would not be at work. This is against requirement (c) and (d) of existing federal law. **Wolff**, supra. Lt. Bragelmann's final decision on the disciplinary hearing affected Petitioner's life, liberty, and property as maximum punishment was assessed for a prisoner who has not had a history of possessing contraband of excess since 1997, 14 years ago. This decision was not **fair** and was not **just**.

In Petitioner's Step II grievance for her first disciplinary case, Ms. Lawson states: "All due process requirements were satisfied..." (See Exhibit K) In Petitioner's Step I grievance for her second disciplinary case, Warden Forrester stated: "...A minor hearing is a less formal administrative procedure; there is no <u>requirement</u> to call witnesses..." (See Exhibit R) In Petitioner's Step II grievnace for her second disciplinary case, Ms. Lawson once again stated: "...All due process requirements were satisfied..." (See Exhibit W) In Petitioner's second minor disciplinary case hearing, Petitioner tried to make a verbal statement to call upon witnesses, i.e. Lt. Bailey and Ms. Coquitt, but was told by Capt. Williams to "keep quiet" (See Facts of the Case dated May 14, 2010) Petitioner was only allowed to utter six words which Capt. Williams only wrote, "Ms. Coquitt is stating I have contraband". These words alone implying Petitioner's guilt. TDCJ Minor Disciplinary Hearing Procedures A(4) states: "...the offender may make a verbal statement in his defense..." (See Exhibit P)

Constitutional violation occurred when penalty was imposed on prisoner without allowing him to call witnesses, in violation of state law and due process requirements, and thus any administrative appeal, whether successful or not, could not cut off prisoner's cause of action under §1983. <u>Walker v. Bates</u> CA2 (N.Y.) 1994, 23 F.3d 652. Federal Established Law states: "a prisoner's disciplinary action must meet criteria minimum procedural requirements...", <u>Wolff</u>, supra. It does not distinguish between a minor or major disciplinary action. Either due process requirements were satisfied or not required at all according to Ms. Lawson and Warden Forrester. For both of them to dismiss Federal Law as insignificant in Petitioner's two minor disciplinary cases and apply punishment accordingly is egregious and outrageous because Petitioner had a constitutional right to call Lt. Bailey and Ms. Shands and others as witnesses during her disciplinary hearings. Question for this

Court is: Does Petitioner have a legitimate right to Due Process requirements and if so, were they satisfied? The answer to the first question should be "YES" because according to case law, the law applies to both minor and major disciplinary cases. Moreover, TDCJ policy does not indicate that no witnesses may not be called in a minor disciplinary hearing. In fact, it doesn't even address it. (See Exhibit P) The answer to the second question should be "NO" because the requirements were not satisfied as Petitioner was not allowed to call upon any witnesses, or confront and cross-examin adverse witnesses. How then, can Warden Forrester and Ms. Lawson both be right? It is apparent that they both are wrong.

Constitutional due process requires administrative agency to accord full and fair hearing in all disputed fact issues critical to rights of parties in question before it. V.T.C.A. Constitutional Statute art. 6252 §13(a); Pierce v. Texas Racing Com'n, 212 S.W. 3d 745. According to A.D. 03.76 of the TDCJ Offender Disciplinary Procedures, it states:

"The Agency is committed to operate a fair, swift, and progressive disciplinary system that embodies constitutional and statutory standards". (Petitioner is not privy to a copy of this TDCJ Rule)

It is apparent that Petitioner would and was not given a fair disciplinary hearings. If prison officials must use objective criteria and follow mandatory procedures under state regulations, then they may be obligated to provide constitutional due process to the prisoner. Hewitt, at 472, 103 S.Ct. at 871-72. State agency's failure to strickly adhere to its own regulations is not denial of due process unless conduct also impunges in constitutional safeguards. Thomas v. Pankey, 837 S.W. 2d 826. Petitioner argues that the rule that applies in her case is not a change in administrative policy in of itself, but rather an administrative decision that interprets a deviation to a standard policy. Petitioner claimed reliance on an independent decision in policy issued by the agency's designee, Lt. Bailey, in a meeting held on

38

June 11, 2009 that was contrary to the standard policy. It was this subjective and objective criteria that Petitioner was relying upon. But prison officials chose to ignore Lt. Bailey's independent decision and applied a disciplinary case against Petitioner. Therefore, by doing so, they became obligated to provide constitutional due process and their failure to do so, impunged on Petitioner's constitutional safeguards. Prison officials even went against their own policy A.D. 03.76. There is ample evidence that Petitioner's Due Process was violated. It is objectively proven that mandatory procedures were ignored and prison officials abrogated their obligation as a state agency in making sure these procedures were adhered to in order that Petitioner's constitutional rights were protected. Petitioner has a compelling interest in filing appeals to obtain freedom from institutional life and any interference to this process is wrong and unconstitutional.

When an agency changes its policy prospectively, a reviewing court need only determine the reasonableness of the interpretation...**Salazar-Regino v. Trominski**, 415 F.3d 436 (2005). Lt. Bailey thought it to be reasonable to make an independent policy decision to allow P.C. inmates to leave items out of their storage box to be confiscated. Whiel this created a solution to a growing problem for P.C. inmates, Lt. Bailey did not articulate this change either in writing or verbally causing much confusion among TDCJ officers. And this led to Petitioner receiving an unmeritted disciplinary case. No where in policy, neither in the Ad.Seg. Plan or in the Administrative Directive (A.D. 03.72) "Offender Property", does it indicate that TDCJ designee Lt. Bailey had authorization to change this policy by mere of an independent decision. TDCJ may argue that as a designee of Warden Black, she is given great latitude to make independent decisions. Then it stands to reason as well that Petitioner was within Lt. Bailey's umbrella of a decision to change or add to a policy and DID NOT violate a TDCJ disciplinary rule. Therefore,

the severe punishment she was forced to endure was an absolute abuse of power, violated Petitioner's constitutional rights, and should be considered cruel and unusual punishment. Actions which exceed agency's statutory authority MUST be reversed. V.T.C.A. Constitution Statute 6252-13(a) §19(e)(2); Texas Alcoholic Beverage Com'n v. Winess of Germany and World Inc., 697 S.W. 2d 817. There is no doubt that Lt. Bailey exceeded her statutory authority. The level of execution abuse of power cognizable under the due process clause is that which "shocks the conscience" violates the "decencies of civilized conduct" or interferes with rights "implicit in the concept of ordered liberty". U.S.C. 5th Amend; Brown v. Nations Bank Corp., 188 F.3d 579 (1999). In the case at hand, Lt. Bailey's refusal to acknowledge her independent decision which led to Officer Shands to write a disciplinary case against Petitioner, interfered with Petitioner's right to seek freedom and liberty when maximum restrictions were imposed upon her. Her behavior "shocked the conscience" because it degraded the decency and position of the title she held that her actions were ethically unacceptable. She allowed an innocent inmate, i.e. Petitioner, to be punished unjustly. In "shock the conscience" substantive due process claim, threshold question is whether behavior of governmental officer is so egregious and outrageous that it may fairly be said to "shock the contemporary conscience..." Kinzie v. Dallas Co. Hosp. Dist., 239 F.Supp. 2d 618. It is without question that the institutional official misconduct by Lt. Bailey was egregious and outrageous in her refusal to support Petitioner and end a punishment that limited Petitioner's amenities. When you coupled this misconduct with another impropriety of dire consequences by Lt. Bailey regarding hair dye she permitted another inmate to escape prosecution, covered it up, and aided and abetted what many officers said could be a potential crime. With incidents of inmate escapes, and the discovery of cell phones in inmates possession, her behavior many officers say should be considered

serious, contemptable, and prosecutorial in every sense of the law.  Lt.
Bailey's behavior also created a stimatizing consequence for Petitioner by
potentially derailing her appellate post-conviction remedies through the court
system when Petitioner's property was taken from her.  Petitioner had to rely
and depend upon outside sources, i.e. family and friends, for the completion
of her Petition for Review to the Supreme Court of Texas and jeopardized
Petitioner's dateline of May 14, 2010.  (See **Exhibit RR** - a copy of the receipt
from Eagle Print and U.S. Postage receipt in order for Petitioner's Petition
be copied and sent to her).

   "Substantive due process" protects against the arbitrary and oppressive
exercise of government power, regardless of the fairness of the procedures.
U.S.C. 14th Amendment; V.T.C.A. Texas Constitution art. I§19; **Hartford Cas.**
**Ins. Co. v. State**, 159 S.W. 3d 212.  An agency decision is arbitrary when
its final order denies parties due process of law; or when it fails to follow
the clear, unambiguous language of its own regulations.  V.T.C.A Government
Code §2001.174(2)(f).  When taken into the totality of the circumstances
surrounding this case, Lt. Bailey made an independent decision based on her
own individual discretion.  This decision of allowing P.C. inmates to leave
items out to be confiscated became prejudiced against Petitioner where it
compromised her constitutional rights.  This addition or policy change became
now part of the institution's regulation and Lt. Bailey failed to follow her
her own regulation.  If she inflated her authority to include that which was
beyond her job description and went outside the means in regulating TDCJ policy
A.D. 03.72 "Offender Property", then this should not be no fault of Petitioner.
But evidence shows Petitioner was accused, found guilty, and punished for
violating a rule which was not a violation at all.  Compound this with 1)
Warden Forrester stating in Petitioner's grievances that there is no due process
requirement to call witnesses and 2) Ms. Lawson stating that all due process

requirements were satisfied. Petitioner had constitutional rights and they violated them erroneously. By Lt. Bailey not wanting to overturn or support Petitioner, can only be characterized as an irrational prejudice against Petitioner, by an unpredictable or impulsive behavior descriptive of Lt. Bailey's power in the position she held. This violated Petitioner's substantive due process. Moreover, knowingly and intelligently allowed her fellow co-workers, i.e. Capt. Williams and Lt. Bragelmann, to severly punish Petitioner. Petitioner not only has raised a "liberty interest" claim, but an Eighth Amendment prohibition against cruel and unusual punishment. Arbitrariness is a signal characteristic of violation of substantive due process. Ford Motor Co. v. Tyson, 943 S.W. 2d 527. In a substantive due process analysis, court's determine (1) whether the plaintiffs had a protected liberty interest, and (2) if the government deprived him or her of that interest capriciously and arbitrarily. Anthony v. State, 209 S.W. 3d 296. It is without doubt that Petitioner has a right to appeal to a Court for her liberty from institutional life, therefore has an interest protected under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. TDCJ ranking, i.e. Lt. Bailey, Capt. Williams, Lt. Bragelmann, Warden Forrester, and Ms. Lawson, tried and did deprived Petitioner her freedom from restraint by their arbitrary and capricious decisions.

In order to provide prospectiveness to Lt. Bailey's institutional misconduct in her leadership role, the Petitioner offers this Court an impropriety of a serious nature under her watch that characterizes her abuse of power.

"On July 7, 2009, P.C. inmates were being transferred from Wing One of Ad. Seg. to E-Dorm. While doing so, P.C. inmates cells were being searched on Wing One and their entire personal property inventoried. In one of the cells, inside a brown trash bag was found to contain a container in what officers identified as "**HAIR DYE**" or "**HAIR COLOR**" for females. This product is not available on commissary. The officer who found the container, Ms. Ruiz, gave it to Lt. Bailey. When all

of the P.C. inmates property was brought to E-Dorm, Lt. Bailey knew the inmate that the HAIR DYE belonged to as this particular inmate had been punished severely in the past for possessing HAIR DYE and using it. Once in our cells, Lt. Bailey approached this particular inmate who is only one cell away from Petitioner, and asked her, "What is this"? The inmate knowing not to act as if Lt. Bailey didn't know what it was with her history with HAIR DYE, simply said, "What are you going to do with me about it"? The inmate said this because previously she had lost level status and all privileges. Lt. Bailey looking at her responded, "I'll think about it", and walked away".

Lt. Bailey kept this incident to herself, the inmate never received a disciplinary case and/or got punished. The only two ways this "HAIR DYE" made its way into the Mountain View Unit was (1) through a relationship with an TDCJ officer, or (2) through the visitation process. Both ways are against TDCJ rules and regulations. TDCJ has a documented history of escapes with stimatizing consequences and a history of correctional officers providing cell phones or contraband to inmates that were used inappropriately to intimidate people such as Texas Congressional officials. Lt. Bailey's impropriety of covering up this incident, points to the fact that HAIR DYE can be used to change a person's appearance facilitating a potential escape. Lt. Bailey is no exception to any rule enforcement. Petitioner brought this incident to the attention of Warden Black when she felt Lt. Bailey's abuse of power affected Petitioner in the most egregious and profound way. "Arbitrary and Capricious" review under Administrative Procedure Act (APA) focuses on reasonableness of its interpretation making process rather than on reasonableness of its interpretation. 5 U.S.C.A. §706(2)(A). On review, federal district courts and Court of Appeals may overturn decision...if it is arbitrary, capricious an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence on the record taken as a whole. Harris Co. Hosp. Dist. v. Shalala, 64 F.3d 220. The reasonableness behind Lt. Bailey's independent decision may have been appropriate. But it is when her decision was not respected by officers, was a clear violation of TDCJ policy giving

her no authorization to change its standard one, an abuse of her discretion, and ultimately Petitioner receiving a disciplinary case for which she received unwarranted punishment, that has become an issue of great importance for this Court to review, and overturn all disciplinary cases against Petitioner.

As a defense strategy, TDCJ may try to argue that Petitioner never dropped an I-60 form to property officer, Ms. Ruiz, as a prerequisite to Lt. Bailey's decision. Petitioner offers this Court the following argument:

P.C. inmates are not allowed to go outside their confined Dorm area. They are to put all outgoing mail in a mail box provided for them in the dayroom. Once the mail is dropped in the mailbox, inmates DO NOT control what happens after that. The routine is as follows: At or around 6:30 a.m., Monday through Friday, and during count time, the duty officer in E-Dorm puts all of the outgoing mail into a blue bag which is then given to the officer picking up the count sheets. He or she then takes the blue bag to the mailroom. Ms. Mayberry, personnel from the mailroom, explained to Petitioner that when they get I-60 forms (forms used to communicate with departmental employees), they are placed in the box according to the departments they indicate. (See **Exhibit SS** - a copy of the I-60 form from Ms. Mayberry) The individual departments are responsible to pick them up. Forms are known to get lost from one building to the next and inmates are having to drop more than one form multiple times. Petitioner has dropped many forms to Ms. Ruiz but one never knows if she gets them or not because she DOESN'T respond to any of the I-60's. TDCJ I-60 forms provide a means for inmates to communicate with personnel and they specifically state:

> "Please abide by the following channels of communication, this will save time, get your request to the proper person and GET AN ANSWER to you more quickly". (See **Exhibit TT** - a copy of the I-60 form)

This is not always the case that inmates receive an answer back. Lt. Bailey and other ranking officials including Ms. Ruiz have bluntly stated

that THEY DO NOT have to answer back. No where in policy does it state that. In conclusion, whether or not Ms. Ruiz got Petitioner's I-60 form to pick up her items, is beyond Petitioner's control and she should not be held responsible if her form got lost or misplaced. Because Ms. Ruiz doesn't respond back, what else is Petitioner to do or how was Petitioner to know whether or not Ms. Ruiz got her form?

Second, when Petitioner received her second disciplinary case (See Facts of the Case dated May 3, 2010), once again, she will show this Court the decisions made against her that can only be characterized as capricious, oppressive, and a gross abuse of power.

When Petitioner's property was first inventoried on April 25, 2010 for her first minor disciplinary case punishment, all of her legal papers were secured on seveval legal writ envelopes which were NOT searched by Officer Keen or Vaughn. Petitioner had inadvertently placed two sweet mate packages and 2 fruit punch drinks within those legal papers by mistake. On the morning of May 3 when Petitioner went to the shower, Ms. Coquitt and Ms. Bell entered Petitioner's cell to do a cell search. They found a writ envelope underneath the headrest of Petitioner's mattress. Petitioner was using it to elevate her headrest the prior night. She was not hiding anything as it was in plain sight. Both of these officers took only this writ envelope containing legal papers and disturbed nothing else. In fact, everything else remained intact. What caught their attention was that another inmates name was on the outside of that writ envelope and according to TDCJ policy Disciplinary Rule 16(a) possession of contraband, it states:

"any item not allowed when the offender arrived at TDCJ, not given or assigned to an offender by TDCJ, and not brought by an offender for his use from the commissary". (See Exhibit UU - a copy of TDCJ Policy)

Naturally, these officers immediately thought that Petitioner had some contraband because the writ envelope had another inmate's name and not hers.

To illustrate to this Court the proper procedure that must be followed when Officers take legal material from offenders, Petitioner sets forth TDCJ policy. According to TDCJ policy ATC-040 page 12 of 16, it states:

VII SCANNING SEARCHES AND CONFISCATING OF OFFENDER'S LEGAL MATERIAL:
  (A)  General Procedures - Definitions
      (2).  Reading to study word-for-word for the purpose of fully comprehending the meaning. Reading an offender's legal material is PROHIBITED.
      (3).  Reasonable suspicion: sensible intelligent, judicious belief in the existence of written contraband. The basis for reasonable suspicion must be documented in the 1-186.
  (B)  Search of Written Material
      (1)  Unless there is reasonable suspicion that written contraband is contained within the offender's legal material, an offender's legal material may only be searched for physical contraband. Scanning or reading a offender's legal material during a search for physical contraband is strictly prohibited.

According to TDCJ form 1-185 Notice of Confiscation of Written or Printed Material During Search for Written Contraband, it states:

"that offender must be advised that her legal material is being removed and confiscated by a staff member and the reason for removal. The form must contain the Warden's Signature".

According to TDCJ for 1-186 Authorization to Search Legal Material for Written Contraband:

"must explain the facts that prove 'reasonable suspicion' and must include the Warden's name who reviewed and constituted reasonable suspicion".

(PETITIONER IS NOT PRIVY TO A COPY OF POLICY ATC-040, FORMS 1-185 and 1-186)

Officer Coquitt's only "reasonable suspicion" that Petitioner had any kind of contraband was Offender's Zamora's name on the outside of the Writ envelope which she immediately saw knowing TDCJ Disciplinary Rule Policy 16(a). But the facts show that Ms. Coquitt performed her duties not according to policy. First, in order for her to have discovered the two sweet mates and the 2 fruit punch packages that were within the sheets of the legal material, she had to have SCANNED Petitioner's legal material. These packages were not visible to the naked eye. She did this without the authorization of the

<u>Warden</u>. Second, TDCJ forms 1-185 and 1-186 were not filled out, Petitioner was not notified that her legal material would be taken because of "reasonable suspicion" of physical contraband, and Officer Coquitt was not given any kind of authorization from the Warden. Instead, when Petitioner returned to her cell, she noticed that her writ envelope was missing. She asked Officer Coquitt about it. She did not answer Petitioner. On her own initiative, she took out all of Petitioner's legal papers out of the writ envelope and while doing so, the two sweet mates and 2 fruit punch packages came out. Ms. Coquitt reasoning that a) an inmate cannot have another inmates legal or regular mail in their possession and b) since Petitioner was on property restriction, she was not allowed any commissary items in her possession. Knowing these facts, Ms. Coquitt knew that Petitioner was in violation of TDCJ policy rules. But the facts are stubborn against her reasoning and process by which she carried out her duty. Petitioner sets these facts to this Court:

(a) The legal papers belonging to Offender Diane Zamora were authorized for Petitioner to maintain in her possession by the Law Library Supervisor Ms. Russell and Officer Ms. Dudley as they exchange these legal papers between offenders on their legal visit on February 10, 2010 as Petitioner is helping Offender Zamora with her legal work.

(b) Officer Keen and Vaughn did not search any of Petitioner's legal writ envelopes on April 25, 2010, therefore anything left in those envelopes were still there days later. Petitioner also found some dental flossers, hair ties, and bobby pins. She reported this to Lt. Bailey and Major Fuster.

(c) Officer Coquitt in her ACCUSING STATEMENT of the disciplinary report accused Petitioner of having contraband - legal papers belonging to another inmate. Nowhere in her accusing statement did she accuse Petitioner of having commissary items (i.e. 2 sweet mates and 2 fruit punches) being on property restriction. It was the legal papers that Officer Ms. Coquitt wanted to pin on Petitioner, otherwise the commissary items would have been mentioned in her ACCUSING STATEMENT, they were not.

Upon informing Sgt. Price and Capt. Williams, Ms. Coquitt was then advised to confiscate the commissary items, the legal papers, and write a disciplinary case against Petitioner. Petitioner tried to explain these facts to Ms. Coquitt,

but she would not hear her. Ms. Coquitt neither called Ms. Russell or Ms. Dudley from the Law Library or got authorization from the Warden using the 1-185 or 1-186 forms to remove legal material. Her actions were <u>strictly prohibited</u> according to TDCJ policy. TDCJ may argue that on a random and/or routine cell search, officers can remove items they believe is contraband and that what Ms. Coquitt is alleged to have not done according to TDCJ policy is not right. While officers can remove items they believe are contraband be a valid argument, taking legal material is treated entirely different. Policy does not distinguish between a random and/or routine cell searches requiring proper procedure for taking legal material. Furthermore, there is no way that Ms. Coquitt could have come across the sweet mates and fruit punches packages unless she took the legal papers out of the writ envelope and <u>SCANNED</u> through them. An even disturbing matter to Petitioner is the fact that these legal papers belonging to Offender Diane Zamora who has a pending civil litigation in the 5th Circuit Court of Appeals againsts TDCJ prison officials that Petitioner was assisting her with, were sent to the property officer, Ms. Ruiz. They were out of Petitioner's sight for a period of 24 hours. Petitioner cannot for certain say these legal papers were <u>NOT</u> copied or read.

Petitioner has more than amply provided this Court with concrete evidence of the type of institutional corruption, oppression, and a gross abuse of power by all ranking levels. Petitioner took her complaints through the administrative processes unsuccessfully. Petitioner asserts that the same personnel who enforce policies within the institution are the same ones who resolve grievances. Whether or not a policy is neglected or abuse is often not recognized as was in Petitioner's case. Petitioner has alleged facts which give rise to a cognizable cause of action and cannot be classified as frivolous and without merit.

## GROUND FOR REVIEW No. 2

Prison officials violated Petitioner's acquired personal property rights that is protected by Federal Established Law under the Fifth and Fourteenth Amendment of the United States Constitution and Texas Constitution. Petitioner was restraint from the freedom of property by removing all of her printing aparatus, i.e. typewriter and pens, from her possession, interfering and prohibiting her from completing her appellate post-conviction agenda in state court through the court system.

## STATEMENT OF THE CASE

Upon receiving punishment after her first disciplinary hearing by Lt. Bragelmann on April 25, 2010, Petitioner's personal property was inventoried and taken away for 30 days. (See Exhibit F) Petitioner was left with No typewriter or pens to print or write. Petitioner DID NOT received an inventory sheet indicating what items she was allowed to have or what items were left behind in her possession. Petitioner reminds this Court that at the time of this imposed punishment, she was facing a deadline to file a Petition for Review to the Supreme Court of Texas of May 14, 2010 in a post-conviction remedy. Faced with this deadline, prison officials forced Petitioner to search and seek help from family and friends in completing her petition. Prison officials created a "property interest" claim for Petitioner, as well as a vested property interest in working towards her freedom and liberty from institutional life protected by the Constitution of the United States.

## ARGUMENT AND AUTHORITIES

A prison inmate has a property interest and libert interest in filing post-conviction appeals. Brewer v. Collins, 857 S.W.2d 819, 823 (Tex. App.- Houston [1st Dist.] 1993 no pet.). At a minimum, state law requires procedures that ensure that an inmate's property right is not arbitrarily abrogated. U.S.C.A. Const. Amend 14; Id. 857, S.W. 2d at 823. Procedural due process

issues are examine in two steps:  first, we ask whether an existing liberty, or property interest has been interfered with, and secondly, we determine whether the procedures attendant upon that interference were constitutionally sufficient. **Sandin v. Conner**, 515 U.S. 472, 477-81, 115 S.Ct. 2293, 132 L.Ed. 2d 418 (1995); **Kentucky Dept. of Correction v. Thompson**, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).  Petitioner has submitted evidence to this Court that proves she was working on her post-conviction appeals, i.e. Petition for Review to the Supreme Court of Texas, and this process was arbitrarily abrogated by prison officials when they egregiously gave Petitioner an unmeritted disciplinary case that imposed a punishment of removing all of her "property" with which she was using to work on this petition.  Prison officials, i.e. Lt. Bailey, Officer Shands, Lt. Bragelmann, Officer Coquitt, Capt. Williams, Warden Black, and Ms. Lawson, all interfered with Petitioner's property and liberty interest which constituted a violation of the Fifth and Fourteenth Amendments of the United States Constitution.  This was a gross violation of Federal Established Law.

The Fourteenth Amendment places procedural constraints on government action that deprives interests recognized as "property" within the meaning of the Due Process Clause. **Smith v. Travis Co. Educ. Dist.**, 791 F.Supp. 1170 (W.D. Tex. 1992); **Memphis Light, Gas, and Water Division v. Craft**, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).  Additionally, when applying the Due Process Clause of the Fourteenth Amendment, the federal courts do not distinguish among different types of property. **North Georgia Finishing Inc. v. Dichem, Inc.**, 419 U.S. 601, 608, 95 S.Ct. 719, 723, 42 L.Ed.2d 757 (1975).  Regardless of Petitioner's guilt or innocence of any rule violation, when imposing a restriction on "property", TDCJ Disciplinary-Property Restriction form 1-0047B (See Exhibit E) number 2, it states:  Petitioner can have "correspondence material", this includes pen/pencil and paper.  Petitioner

had paper but no pens.  (See Exhibit F)  After her property was taken away, the very next day, Petitioner asked the duty officer if she could have her pens because she had nothing to write with.  The duty officer informed her that once property was inventoried and taken to the property room, nothing could be removed.  Petitioner's Inmate Trust Fund on April 22, 2010 had only $.12.  (See Exhibit VV - a copy of Petitioner's bank statement).  P.C. inmates had a commissary run on April 29, 2010 and could have brought some more pens at that time but Petitioner was unaware that a deposit was posted on April 27, 2010.  Bank statements come on the 10th of each month.  Therefore, she did not purchase items on that commissary run.  Before the next commissary run, Petitioner checked with the Law Library Supervisor, Ms. Russell, to see if her trust fund account was active.  (See Exhibit WW - a copy of the I-60 form from Ms. Russell's response).  Petitioner was able to buy correspondence material from commissary on May 6, 2010.  (See Exhibit XX - a copy of the commissary purchase) "...Before plaintiffs can establish a claim for denial of due process, plaintiffs must alleged that they have been deprived of a property interest.  Plaintiffs argue, and the Court agrees, that before a person may be denied a legitimate claim of entitlement, that person is entitled to procedural due process".  Bd of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Samaad v. City of Dallas, 733 F.Supp. 239 (N.D. Tx. 1990).  Petitioner's entitlement is to be free from the restraint that deprived her the right, privilege, and interest to life outside the prison walls.  Having a typewriter is a privilege that Petitioner brought through commissary.  Pens is a right Petitioner is entitled to have, to be able to correspond.  Prison officials restraint her from pursuing through legal remedies freedom from this institution.  Petitioner was entitled to her property in order to work on her petitions.  To have her property be taken from her unjustly proves the restraint imposed wrongfully by TDCJ prison

officials.  Moreover, as discussed earlier, Petitioner was not even accorded the full requirements of procedural due process under **Wolff**, supra.

For purposes of due process under the Fourteenth Amendment, property interests are not created by the Constitution; rather they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings.  **Blackburn v. City of Marshall**, 42 F.3d 925.  TDCJ Existing Rule and Policy form 1-0047B "Disciplinary-Imposed Property Restriction" indicates the following:

"The property items below are to be restricted for the time period indicated above".

(B)    all personal property except the following permitted items:

    (1)  legal material

    (2)  correspondence material

    (3)  religious literature

    (4)  incoming and outgoing mail

    (5)  hygiene items

    (6)  clothing necessities

    (7)  cell lamp

    (8)  educational material

(See Exhibit E)

The TDCJ policy is vague in describing correspondence material.  In order to correspond, Petitioner would need pen/pencil and paper.  Paper alone would be insufficient.  Petitioner's only 3 pens were taken from her.  (See Exhibit F) According to TDCJ commissary policy, an inmate on commissary restriction (as Petitioner was), are able to purchase hygiene and correspondence items every 30 days.  (See **Exhibit YY** - a copy of the commissary policy)  Petitioner was able to purchase a pen and paper **12 days** after her property was taken from her. (See Exhibit XX)  Petitioner lost days and time in preparing her Petition to

the Supreme Court of Texas. One cannot be deprived of property interest in thing allegedly taken away. **Reimer v. Smith**, 663 F.2d 1316. In order to establish due process deprivation of property interest under the 14th Amendment, plaintiff must establish that he had "legitimate claim of entitlement" to that interest. **Montez v. South San Antonio I.S.D.**, 817 F.2d 1174. Prison's failure to make available writing materials...violate the equal protection clause of U.S.C.A. Constitution Amendment 14 as well as right to access to courts. **Wade v. Kane**, E.D. Pa. 1978, 448 F.Supp. 678 affirmed 591 F.2d 1330. According to TDCJ rules, Petitioner has an absolute privileges to buy a typewriter and pens. She also has a legitimate interest to work and appeal her conviction in a court of law. Upon receiving "property restriction" for an unmeritted disciplinary cases, Petitioner was restricted in all manner to proceed with her interest in liberty and access to courts in violation of the 14th Amendment of the U.S. Constitution. Furthermore, according to TDCJ form 1-0047B(2), Petitioner was entitled to her writing materials regardless whether or not property restriction was imposed upon her. Therefore, Petitioner has established a property interest claim.

Petitioner has alleged facts which give rise to a cognizable cause of action and cannot be classified as frivolous and without merit.

## GROUND FOR REVIEW No. 3

Prison officials subjected Petitioner to endure cruel and unusual punishment by placing her on restrictions causing unnecessary and wanton infliction of pain prohibited by Federal Established Law under the Eighth Amendment of the United States Constitution. Petitioner suffered undue circumstances such as medical problems, heat exhaustion, eating and drinking without utensils, harrassment and oppression.

## STATEMENT OF THE CASE

Upon receiving severe punishment for an unmeritted disciplinary cases, Petitioner has been injured and has suffered unwanton pain inflicted by prison officials from their capricious decisions, abuse of power, and oppression that was undue and unnecessary. Petitioner presents to this Court the following facts that support such situations:

(1)  On April 13, 2010, Petitioner went to recreation on the outside grounds. Immediately after she return to her cell, she developed a raised rash on both sides of her neck. It had blisters containing drainage. The nurse was called and Petitioner was scheduled to see the doctor the next day. At mid-afternoon, Petitioner saw the doctor, and at first thought it was herpes, then determined it was a moderate case of shingles. The heat from the sun somewhat precipitated this condition. He took a culture of the drainage, ordered dressing changes daily for 5 days, and placed her on antibiotics. (See **Exhibit ZZ** - a copy of the medical report)

(a)  When Petitioner's property was confiscated as punishment for her disciplinary case on April 25, 2010, her fan was taken too. As heated temperatures rose outside to above 90 degrees, the walls in E-Dorm being of alumimum, made the temperature inside the Dorm to rise as well. Heat was a factor to her present condition on her neck. Any exposure to heat, she would develop redness and a raised rash on both sides of her neck. When this happen, Petitioner sought medical attention again and was scheduled to see the doctor. (See **Exhibit AAA** - a copy of the medical pass to see the doctor). Nurse Rodriguez assessed her condition and concluded Petitioner's need for some type of ventilation was essential as heat she believed might be causing the rash to return. Petitioner begged the officers to leave the hallway fan on. Some officers would, others would not.

(b)  Petitioner made an inquiry to Warden Forrester to obtain her

fan. She responded, "We will be allowing offenders to keep their fans after June 1st". She refused to give Petitioner her fan despite her medical condition. (See Exhibit U) This decision is not one that Warden Forrester had made independently. Permitting inmates to have fans during the heated summer months came after several inmates DIED of heat exhaustion. It took their deaths in order for TDCJ to reverse their policy risking inmates lives at that time.

(c)    In the **FACTS OF THE CASE**, dated May 20, 2010, Officer Stephens neglecting to give Petitioner ventilation, exposed Petitioner to heat exhaustion, causing her to develop an irritation to her neck. This is a gross type of oppression.

(d)    In the **FACTS OF THE CASE**, dated May 21, 2010, Petitioner pleaded with Officer Morales for ventilation. Officer Morales obtained a direct order from Lt. Bailey to leave fan on continously towards Petitioner's cell for ventilation.

(e)    In the **FACTS OF THE CASE**, dated May 28, 2010, another form of oppression by Lt. Bragelmann using Officer Lara to do her oppressing. Turning the fan away from Petitioner would serve no one other than an empty room. Having the fan towards the Petitioner was not harming anyone. The only one Lt. Bragelmann was harming with this decision was Petitioner.

(f)    In the **FACTS OF THE CASE**, dated June 1, 2010, it was as Warden Forrester had suggested. It was until this date that Petitioner finally receives her personal fan back. But from April 25, 2010 to May 31, 2010, Petitioner endured heat exhaustion to her neck, making the rash appear and disappear, providing discomfort, pain, and sufferring for Petitioner.

(2)    Every inmate at meal time is given a tray, spoon, and a cup for a beverage, if they don't have one of their own. When Petitioner went on property restriction, Petitioner was left with her drinking cup. But on May 3, 2010 (8 days into her restriction), her cup was taken from her. (See Exhibit J) Afterwards, she was having trouble getting something to drink at meal time, because the kitchen and/or officers did not provide her with a drinking cup. As the heated months began, Petitioner had no other way to drink liquids other than her hands. Officers stated that by not having a drinking cup was part of her punishment even though policy doesn't state that. Petitioner informed Warden Forrester on 5/17/10 (See Exhibit S) Whoever she reminded at the kitchen did not followed through as the problem continued. Officers Nash, Davidson, White, and Olson were frustrated that they could not offer Petitioner something to drink for lack of a cup. Petitioner was at times offered the personal cup of another prisoner. Again, Petitioner informed Warden Forrester about this continued problem on 5/31/10, 28 days after they took her cup. Apparently, correcting a human basic need was not one of Warden Forrester's top priority. Instead, she allowed Petitioner to be deprived of a drink during meal time as every inmate is allowed. A gross form of oppression. **(See Exhibit BBB —** a copy of the I-60 form from Warden Forrester).

(3)  When Officer Coquitt confiscated Petitioner's legal papers that
     had another inmate's name on it but were legally exchanged for
     Petitioner to have in her possession, she along with Capt. Williams,
     Sgt. Price, Warden Forrester, and Ms. Lawson decided to ignore
     policy and force a disciplinary case upon Petitioner.  Officer
     Coquitt violating rules and on her own, SCANNED AND SEARCHED
     Petitiofner's legal papers.  According to the Offender Orientation
     Handbook Chapter 4 states:
     II.  Offender's Personal Legal Material
          (B)  Search and Shakedown of Offender Legal Materials
               (2)  Search of Written Materials:  An offender's personal
                    legal materials may only be searched for written
                    contraband if there is a reasonable suspicion that
                    written contraband is included in them.  This must
                    be documented in writing prior to search, using the
                    1-185, "Notice of Confiscation of Written or Printed
                    Material During Search for Written Contraband", and
                    1-186, "Authorization to Search Legal Material for
                    Written Contraband", form, and performed in accordance
                    with the procedures contained within the Access to
                    Courts Policy Manual.  (See **Exhibit CCC** - a copy
                    of the TDCJ policy)
     Officer Coquitt chose to ignore every detail of this policy and
     abused her power coupled with the support of her superiors.  If
     prison officials are allowed to bypass, ignore, and turn a blind
     eye on rules, regulations, and policies and punish inmates as they
     so wish, this should cause for concern not only for this Court but
     those who expect that TDCJ policies be respected, implemented, and
     enforced.  Again, this is another form of a gross abuse of power
     and oppression.

(4)  The disciplinary case given to Petitioner by Ms. Coquitt should
     have never been enforced or processed.  Ms. Coquitt in her ACCUSING
     STATEMENT of the offense report stated that Petitioner had contraband
     possessing legal papers with another inmate's name on them.  Not
     once did she accused Petitioner of having contraband - 2 sweet mate
     packages and 2 fruit punch packages - in her ACCUSING STATEMENT.
     When her legal papers were returned back by Lt. Bailey the very
     next day, they were no longer contraband as Petitioner had permission
     to possess those legal papers.  Again, prison officials abused their
     power by allowing the case to process and impose punishment for
     this unmeritted disciplinary case.  Instead of re-writing the case
     over and accuse Petitioner of possessing commissary items she should
     not have, they just allowed this injustice to go forward.  (Petitioner
     is not privy to a copy of the offense report for this Court).

(5)  When Law Library Supervisor Ms. Russell and Officer Dudley randomly
     searched Petitioner's cell on June 23, 2010, it was not understood
     why they did so or for what purpose by the Ad. Seg. Sgt. Guzman.
     When Petitioner address this issue with Sgt. Guzman, she told Petitioner
     that she would find out who had ordered the random search and why
     was she not notified as they should have done.  Later, Sgt. Guzman
     informed Petitioner that she had spoken to Warden Black and that
     this type of search would not happen again without her knowledge.
     Another form of abuse of power and oppression.

(6) Petitioner was subjected not to one thorough and efficient cell search and property inventory, BUT THREE inventory searches by three different officers (Ms. Keen on April 25, 2010, Ms. Coquitt on May 3, and Ms. Thomas on May 14, 2010) because officers could not come into agreement about what exactly Petitioner could and could not have during property restriction. They egregious avoided policy and did things as they saw fit. These same officers work in Ad. Seg. on a rotation basis, they receive inmates for pre-detention and/or admit inmates into Ad. Seg. housing on a continous basis. They do inventory on every inmate coming into Ad. Seg. If anything they are experts on deciding what an inmate can and can not have on property restriction. How is it then, that they cannot figure out the same for Petitioner? Petitioner asserts that this behavior can only be described as harrassment and oppression.

(a) Officer Shands continue this chirade of harrassing Petitioner about her night lamp. In the FACTS OF THE CASE, dated May 26, 2010, she approached Petitioner about this. Had she read policy and form 1-0047B, she would have known that Petitioner can have her night lamp under property restriction. She too works in Ad. Seg and does continous inventory on inmates there. This type of oppression should not have occurred as Petitioner was within policy guidelines.

(7) In the FACTS OF THE CASE, dated July 6, 2010, another way to harrass and oppress Petitioner. Captain Williams had every right to question Petitioner about an inquiry or investigation of any sort. But that was not the way she approached Petitioner. Had she read the facts of the case, that Petitioner was no longer on property restriction since June 24, 2010 and was now allowed all of her property back, she would not have asked the questions that she did. Furthermore, she disbelieved Petitioner that she had any kind of evidence that her pens were taken from her and requested to see prove. TDCJ has all of the original documents of every activity pertaining to every inmate. Had Petitioner not have her inventory sheet of April 25, 2010 when her property was taken from her, there is no doubt in Petitioner's mind that the original copy would never surface or be available in a contentious legal action. But Petitioner did what was asked of her, and she presented Capt. Williams with her copy of the inventory sheet. This type of harrassment is unjustified.

(8) After exhausting her administrative remedies without success, Petitioner's family sought the assistance from the Ombudsman in Huntsville, Texas. On three occassions (June 23, 2010, July 1, 2010, and August 11, 2010 - See Exhibits Z, EE, and HH), the Ombudsman refused to respond even after all grievances were reviewed and evaluated. Petitioner was strangled, so to speak, from resolving the issues presented in this petition. Her family was treated no differently.

(9) In the FACTS OF THE CASE, dated June 24, 2010, Petitioner suffers not only oppression but now damage to her property, i.e. typewriter. To allege by TDCJ prison officials that by Petitioner signing the property inventory sheet when her property was return to her, is accepting that all of her property is as is when it was taken from

57

her on April 25, 2010, is blantly wrong. The forms DO NOT indicate
no such language. (See Exhibit AA at the bottom) To have dumped
Petitioner's property in her cell while she was in the shower is
no way of assuring Petitioner that all of her property is not broken.
On April 25, 2010, Officer Keen witness Petitioner typing as Ms.
Keen confirmed to Petitioner in a conversation, it was in perfect
condition before it was taken from her. And before it was taken,
Petitioner TYPED AND DATED her Step I grievance after disciplinary
actions were imposed upon her. (See Exhibit G) Afterwards, it was
out of Petitioner's sight for a period of 2 months and TDCJ Prison
officials CANNOT GUARANTEE Petitioner that NO ONE damaged her
typewriter. They DO NOT have 24/7 personnel guarding such property.
They should be held responsible for property seized and anything
returned broken, should not be upon Petitioner to prove TDCJ personnel
broke it. For purposes of policy, if Petitioner's typewriter was
indeed broken on April 25, 2010 when it was taken from her, Ms.
Keen would have confiscated it, asked Petitioner what disposition
she wanted to do with it, and a copy of that confiscation given
to Petitioner. No CONFISCATION sheet was done. Instead, an INVENTORY
sheet was done and her property placed in the property room. Moreover,
if Petitioner's typewriter was broken, TDCJ WOULD NOT RETURN THE
BROKEN ITEM BACK TO PETITIONER AS INMATES CANNOT HAVE JBROKEN ITEMS
IN THEIR POSSESSION. (See Exhibit F) Yet, it was returned to her
broken. This might explain why the property officer, Ms. Ruiz,
herself DID NOT return the property. Instead, it was Sgt. Guzman
who might not have known that the typewriter was broken. Petitioner
files STEP I & II grievances unsuccessfully. TDCJ prison officials
refuse to accept responsibility and accountability for her broken
typewriter. (See Exhibit G & K) This institution is managed by
individuals who manipulate and hide facts and actions in order to
justify and wrongdoing by TDCJ employees. But the facts are stubborn
against their reasoning, explanations, and decisions.

(10) While Petitioner awaited responses from her Step I & II grievances
on her typewriter, she submitted a blue slip to be approved to buy
another typewriter on August 26, 2010. It was now close to 4 weeks
without having this approval, she re-submitted another blue slip
with her commissary slips on store day for P.C.'s on September 28,
2010. Commissary slips records show she submitted these blue slips.
Petitioner files a Step I grievance on October 3, 2010 requesting
a reason why her blue slip approval is not beeing approved. Soon
after this filing, that on October 6, 2010, the blue slip approval
arrives in the mail for Petitioner. (See Exhibit II & JJ) It took
9 days to get the second blue slip approval while the first one
never came. TDCJ responding that there is no record of a previous
request is FALSE AND MISLEADING because Ms. Darsey, Commissary
Supervisor, was in constant contact with Petitioner about her first
blue slip as it is through her that blue slips are handled and
sent in order for an inmate to purchase special items, i.e. typewriter.
(See Exhibit II) Petitioner contacted Ms. Darsey about this. (See
Exhibit DDD - a copy of the I-60 form from Ms. Darsey) It is not
surprising to Petitioner that Ms. Darsey is now claiming that she
has no record of Petitioner submitting a blue slip on August 26,
2010. But Officer Lara was the officer who took Petitioner's blue
slip and placed it in the commissary bag for Ms. Darsey to pick up.

## ARGUMENT AND AUTHORITIES

As to convicted felons, violation of Eighth Amendment's prohibition against cruel and unusual punishment occurs if two requirements are met:

(1) under objective requirement, deprivation must be so serious as to deprive prisoners of minimal civilized measures of life's necessities, as when it denies prisoner some basic human need, and

(2) under subjective requirement, Court looks of the state of mind of defendant, and deliberate indifference on part of prison officials will suffice to meet such requirement.
**Harris v. Angelina County**, Tex. 31 F.3d 331.

Constitutional protections accorded to inmates specifically include the Eighth Amendment prohibition against cruel and unusual punishment. **Whitley v. Albers**, 475 U.S. 312, 318, 106 S.Ct. 1078, 84 L.Ed.2d 251 (1986). Punishment rises to the level of cruel and unusual punishment if it involves an "unnecessary and wanton infliction of pain". **Estelle v. Gamble**, 429 U.S. 97, 104 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); **Gregg v. Georgia**, 428 U.S. 153, 173, 96 S.Ct. 2009, 2935, 49 L.Ed.2d 859 (1976).

Petitioner met the two requirements constituting cruel and unusual punishment and are as follows: Under the OBJECTIVE criteria:

(a) exposing Petitioner to endure heat exhaustion by taking her personal fan away unjustly and then neglecting her any type of ventilation thereby making the condition on her neck to sustain repeated recurrences.

(b) Petitioner was denied the means to hydrate herself with liquids, i.e. drinking cup, on a daily basis and at meal times for about 2 months.

(c) TDCJ policies were ignored or abused, and then forcing Petitioner to endure disciplinary actions by imposing maximum punishment.

(d) Petitioner was further mistreated by having her cell searched repeatedly and without reason.

(e) Petitioner was h arrassed by repeatedly telling her she was having items she should not have, inventoring her property 3 times and verbally stating she was not in compliance in regards to property restriction.

(f) After her family complained to the Ombudsman, Petitioner was approached by prison personnel to answer the complaint and then asked to provide prove when TDCJ has all the prove at their disposal.

(g) When Petitioner's property was taken from her, her typewriter was in good condition, and then when it was returned, it was totally broken.

Under the SUBJECTIVE criteria:

(a) The deliberate indifference to Petitioner's medical condition was met with disregard and unconcern for any ventilation.

(b)  The deliberate indifference to Petitioner's basic human needs, i.e. health, hydration, and peace of mind, during her punishment months were placed at risk which are vital to the maintenance of prison life.

(c)  The deliberate indifference of abuse of power, harrassments, oppressions by prison officials goes against what conventional wisdom is in operating an agency and/or prison institutions.

(d)  The deliberate indifference of trying to silence Petitioner and/or her family when they raised a legitimate complaint to a higher hierarchy by intimidation.

(e)  The deliberate indifference and disregard for the care and protection of Petitioner's property while in their possession and their negligence to accept responsibility and compensate Petitioner for her broken property.

Petitioner should be free of any type of deliberate indifferences. Prison officials should conduct operations of their institutions in an unbias and unprejudicial manner in order not to discriminate one from another.

An express intent to inflict unnecessary pain is not required, **Estelle v. Gamble**, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference" to a prisoners serious medical needs is cruel and unusual punishment), and harsh "conditions of confinement" may constitute cruel and unusual punishment unless such conditions "are part of the penalty that criminal offenders pay for their offenses against society". **Rhodes v. Chapman**, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). The harsh conditions of confinement Petitioner was forced to endure were 1) that all of Petitioner's property was taken from her including her fan needed to provide ventilation and not expose heat to her neck to avoid recurrence of lesions; 2) that the doctor warned Petitioner that the drainage of these lesions was dangerous to her eyes if she used her fingers to touch these lesions and then touched her eyes that could cause her to go blind; 3) that the constant harrassments causing psychological instability to Petitioner's day-to-day life; 4) force to endure punishment despite violations of rules, regulations, and policies by prison officials; and 5) forced to purchase a much more expensive typewriter with the help of family and friends because TDCJ prison officials refuse to replace her other typewriter and/or accept

60

responsibility that they returned it to Petitioner broken while in their possession. NO WHERE in the Judgment of Petitioner's Conviction does it state that what prison officials have subjected Petitioner to endure as punishment was part of the penalty the Petitioner had to pay against society. It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultous cell block. Estelle v. Gamble, supra, at 105-106, 97 S.Ct. at 291-292. When prison officials, i.e. Warden Black and/or Warden Forrester, stubbornly refused to acknowledge the independent decision of Lt. Bailey letting P.C. inmates to leave items out of their storage boxes to be confiscated to be sent home and avoid imposing disciplinary punishment against Petitioner, their conduct can only be characterized as obduracy and wantonness prohibited by this Clause. It is questioned that "[c]onfinement in a prison...is a form of punishment subject to scrutiny under the Eighth Amendment standards". Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). Today, the Eighth Amendment prohibits punishments which although not physically barbarous, "involve the unnecessary and wanton infliction of pain", Gregg v. Georgia, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976), or are grossly disproportionate to the severity of the crime. Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). The disciplinary punishment that Petitioner was forced to endure for two months was grossly disproportionate, unmeritted, unfounded by the evidence, and the maximum allowed punishment was cruel and unusual for a prisoner with no prior major/minor disciplinary cases for over 14 years. Her disciplinary record speaks for itself that shows she is not a disgruntle inmate but a model discipline one.

61

In Calhoun v. Hargrove, 312 F.3d 730, 734-35 (5th Cir. 2002), the Court has found that an inmate stated an Eighth Amendment claim by alleging that a prison guard knew that he had a medical condition and a medical restriction but required him to work in excess of that restriction. There is no doubt that every TDCJ officer who worked in E Dorm, knew Petitioner had a medical condition as dressing changes to her neck were done in their presence, her bandages were visible, and took her antibiotic medications in front of them. The drainage from the lesions was witnessed by Officers Keen, Keller, and Griffin. With Petitioner's personal fan taken from her, with no windows or vents to provide her with ventilation, and temperatures inside E Dorm rising, is evidence that Petitioner's exposure to heat exacerbated her condition and therefore, has stated an Eighth Amendment claim. A prison official may be held liable under the Eighth Amendment for failure to protect only if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 847, 114 S.Ct. 1970. Whether it be Herpes or Shingles, Petitioner had an active contagious condition with open lesions and drainage. Furthermore, the doctor warned Petitioner of the seriousness of her condition advising her not to touch the liquid drainage and then touch her eyes because she could go blind. From Ms. Lawson, Warden Black, Asst Warden Forrester, Lt. Bailey, Lt. Bragelmann, Captain Williams, and many officers KNEW of Petitioner's condition and open lesions and its serious, yet, disregarded her condition as insignificant by failing to return her personal fan, refused to overturn her disciplinary case, and when measures were taken, those in authority chose to abuse their authority and made Petitioner suffer heat exhaustion undeserving. Petitioner has the privilege and right to live a life within the prison institution in a peaceful non-threatening way. Her physical status and psychological sanity should not be disturbed unless her behavior so requires

that TDCJ implement measures for the security of the institution.  These are basic needs of a prisoner in order to function appropriately and should not be violated by mere abuse of power of oppression.

Petitioner demonstrated, inter alia, an objective component of conditions so serious as to deprive her of the minimal measure of life's necessities. **Berry v. Brady**, 192 F.3d 504, 507 (5th Cir. 1999).  Likewise, Petitioner has demonstrated the objective component of a persistent rash, swelling, lesions, and drainage to both sides of her neck.  It was precipitated by the exposure of heat as when she had gone outside for recreation on April 13th and later that night developed the raised rash, swelling, and lesions with drainage. By prison officials imposing upon Petitioner unjust punishments and removing her personal fan disregarding that the building in E Dorm was above normal temperature creating a heated environment, it exposed Petitioner to an increase in that heat in which it furthered her medical condition.  Rash or any swelling to the neck is a serious condition that can have fatal consequences had the swelling gone "internally" creating a blockage to the airways creating a life or death situation.  Petitioner expressed this concern to the doctor, nurse, and duty officers.  Breathing is not only a minimal measure of life's necessity, its one that is needed for survival.  Any type of interference or jeopardy should never be regarded as insignificant.  "[A] prison official is deliberately indifferent when he knows or should have known of a sufficiently serious danger of an inmate".  **Young v. Quinlan**, 960 F.2d 351-61 (C.A. 3, 1992).  Deliberate indifference describes a state of mind more blameworthy than negligence.  **Estelle v. Gamble**, 429 U.S. at 104, 97 S.Ct. at 291.  TDCJ prison officials "knew" of the potential seriousness to Petitioner's health but chose to disregard the risk to her.  They were aware of the facts from which the inference could have been drawn that a substantial risk of serious harm existed.  Petitioner had bandages around her neck visible to everyone.

Therefore, it is indeed fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. The <u>state of mind</u> of TDCJ prison officials was to "<u>intentionally</u>" impose unmeritted disciplinary cases with maximum punishment upon Petitioner "<u>consciously disregarding</u>" her medical condition. **Whitley**, supra, an Eighth claimant must show more than "deliberate indifference" or otherwise...that officials applied force "maliciously and sadistically" for the very purpose of causing harm. 503 U.S. at 6, 112 S.Ct. at 998. Petitioner has presented evidence to this Court that prison officials took pleasure in mistreating Petitioner by ignoring policies, rules, and regulations and applying at will punishments for the simple purpose of causing harm physically, emotionally, and mentally. The Eighth Amendment does not outlaw cruel and unusual "<u>conditions</u>", it outlaws cruel and unusual "<u>punishments</u>". Petitioner has the right to be free from cruel and unusual punishments.

According to 42 U.S.C. §1997e(e), "[N]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury". There is no doubt that Petitioner had a physical injury harmed by and precipitated by heat from the sun rays which was then "<u>furthered persisted</u>" when prison officials denied her ventilation of any sort exposing Petitioner to more heat inside E Dorm. Petitioner also endured constant harrassment and oppression at the hands of Officers Shands, Coquitt, Stephens, Lt. Bailey, Lt. Bragelmann, Capt. Williams, Warden Forrester, and Ms. Lawson. All of them had knowledge of Petitioner's medical condition but preferred to show deliberate indifference. It is noteworthy to recognize that herpes and/or shingles are "<u>contagious</u>" and can "<u>spread</u>" if left untreated or disregarded as insignificant especially if the "<u>lesions</u>" are "<u>active</u>" with drainage as was in Petitioner's case. It is a viral infection of certain

sensory nerves affecting the Central Nervous System of the body that can cause a disturbance in a person's mental and emotional state. Petitioner's condition put a strain in her mental and emotional state. At times unsure what a day would be like every waking moment, Petitioner was on constant guard of her person and belongings because of the uncertainty on how Rank and/or officers would be treating her that day affecting her emotionally and mentally. TDCJ officials may try to argue that they are not the cause of Petitioner's injury, but the fact is that they contributed to it in some way or another with undue harrassments, oppressions, and punishments. That her fan was taken from her, the air conditioning was turned off, and the hallway fan turned away from her, were all contributing factors that exposed Petitioner to heat causing the injury to her neck to persist. These facts are stubborn against their arguments, if any. Petitioner further had to endure the mistreatment of her property, i.e. Clear Tech typewriter, in that it was returned to her "BROKEN" by prison officials and with unsuccessful pleas to have it fixed or replaced, she found herself being denied and then blamed for not reporting it appropriately and forced indirectly to buy a New more expensive typewriter. (See **Exhibit EEE** - a copy of the receipt from commissary). It must be noted that Petitioner's Clear Tech typewriter was "NOT BROKEN" at the time they placed her on property restriction because 1) AFTER her first disciplinary hearing on April 25, 2010 at 7:30 p.m. and 2) BEFORE TDCJ prison officials confiscated her property including her typewriter, Petitioner "TYPED" her Step I grievance against her first disciplinary hearing. (See Exhibit G) This is evidence that it was "NOT BROKEN". For two months, Petitioner's typewriter was out of her sight, was in the hands of TDCJ personnel, and only they had access to it during that time.

Existence of improper motive for disciplining prisoner which results in interference with constitutional right may give rise to cause of action

pursuant to 42 U.S.C. §1983.  Evidence shows that Petitioner was improperly

disciplined being accused and found guilty of violating TDCJ rules when in

fact the opposit is true.  Petitioner has presented operative facts giving

rise to a right enforceable by the Court because there was interference with

her constitutional right(s).  And these facts are:

1)  that Petitioner was accused, found guilty, and punished for violating
    TDCJ rules 16 and 35;
2)  that Petitioner was given permission by Lt. Bailey to leave items
    out of her lockbox for confiscation and therefore DID NOT violate
    rules 16 and 35;
3)  that Petitioner was accused, found guilty, and punished for violating
    TDCJ rule 16 for possessing legal material of another inmate;
4)  that Petitioner was authorized by the Law Library Supervisor to
    possess legal material of another inmate and therefore DID NOT violate
    rule 16;
5)  that Petitioner was given maximum punishment for unmerited disciplinary
    cases;
6)  that Petitioner's property was confiscated unjustly;
7)  that Petitioner's access to courts was interfered with when all of
    her manner of writing was taken from her and potentially derailing
    her to file a petition to the Texas Supreme Court on time;
8)  that Petitioner was denied means to hydrate or feed herself by not
    providing utensils at meal time;
9)  that Petitioner's property, i.e. typewriter, was given back to her
    BROKEN:
10) that Petitioner was under medical care for a condition that was active,
    contagious, and had potential risk to block her breathing had the
    swelling gone internally;
11) that Petitioner was denied ventilation needed to improve her medical
    condition by confiscating her personal fan and then the alternative
    was either refused or curtailed in some way contributing to her
    medical condition;
12) that Petitioner was harrassed and oppressed without due cause;
13) that Petitioner was denied assistance from the Ombudsman.

State and local officials who abuse their official power act under color

of state law.  The governing principle is that "'[M]isuse of power, possessed

by virtue of state law and made possible only because the wrongdoer is clothed

with the authority of state law, is action taken "under color of" state law'".

**Monroe v. Pape**, 365 U.S. 167, 184 (1961)(quoting **U.S. v. Classic**, 313 U.S.

299, 325-26 (1946)).  From the Representative from Huntsville, Ms. Lawson,

to the Mountain View Assistant Warden, Warden Forrester, to Capt. Williams,

Lt. Bragelmann, Lt. Bailey, to Officers Shands, Stephens, and Coquitt, facts

prove of their abuse and/or misuse of power by the cloth of authority given to them.

After exhausting all administrative remedies pursuant to the Prison Litigation Reform Act (PLRA), Petitioner urges this Court to grant relief that TDCJ prison officials did violate Petitioner's constitutional right(s) and damaged her property and ORDER:

1) that disciplinary cases dated April 16, 2010 and May 4, 2010 be dismissed and removed from Petitioner's prison records;

2) that Petitioner's Clear Tech typewriter be compensated for the damage that was cause to it or a full refund for the cost of the broken typewriter and the difference Petitioner paid for the New Swintec typewriter OR the total purchase price Petitioner paid for the New Swintec typewriter (See Exhibit EEE) pursuant to V.T.C.A. Government Code §501.007 and TDCJ A.D. VIIIG(1) Restitution of property;

3) assess actual, compensatory, and punitive damages for Petitioner's constitutional rights(s) violations, pain, emotional and mental injury suffered while in TDCJ's custody.  The grievance process does not afford monetary relief pursuant to TDCJ Administrative Directive Principles and Practices Chapter III page 5 "Non-Available Remedies".

In **Carey v. Piphus**, 435 U.S. 247, 263-64, the Court noted that the primary purpose of the damages remedy is §1983 litigation is "to compensate persons for injurious caused by the deprivation of constitutional rights".  Actual damages caused by a denial of procedural due process may be based on either the emotional distress caused by the denial of fair process, or by an unjustifiable deprivation of liberty or property attributable to lack of fair process.  (mental and emotional distress actually caused by denial of procedural due process is compensable under §1983) In **Smith v. Wade**, 461 U.S. 30 (1983), the Supreme Court held that a §1983 plaintiff may recover punitive damages

67

against an official in her personal capacity, if the official acted with a malicious or evil intent or in callous disregard of the plaintiff's federally protected rights.  Punitive damages may also be used on "oppressive" conduct when the defendant misused authority or exploited the plaintiff's weakness. **Dang v. Cross**, 422 F.3d 800, 809-11 (9th Cir. 2005).  "Although the specific intent to violate plaintiffs federally protected right will support a punitive damages award, 'reckless indifference' towards a plaintiffs federally protected right also suffers to authorize liability for punitive damages under §1983". **Powell v. Alexander**, 391 F.3d 1, 19 (1st. Cir. 2004).  The Smith standard does not require a showing that the defendant engaged in "egregious" misconduct. **Kolstad v. Am.Dental Assn.**, 527 U.S. 526, 538-39 (1999).  The majority view in the circuits is that punitive damages may be awarded even when the plaintiff recovers only nominal damages.  Pain may be an element of 42 U.S.C. §1983 emotional damages in aprocedural due process case if proved to have been caused by the violation.  **Fowlder v. Carolton Public Library**, 799 F.2d 976, reh denied 803 F.2d 717.  Civil rights claim permits the award of compensatory damages for mental anguish suffered as a result of deprivation of constitution rights.  **Covington v. Beaumont I.S.D.**, 738 F.Supp. 1041.

Petitioner has made a compelling argument against TDCJ prison officials who abused their power, deprived Petitioner of her federally protected constitutional right(s), acted with a malicious or evil intent to harm Petitioner, harrassed and oppressed her, exploited her weaknesses in her defense against misused power, acted in a egregious and outrageous manner when they refused to follow their own rules and regulations and caused emotional and mental anguish by imposing cruel and unusual punishments prohibited under the Eighth Amendment involving the unnecessary and wanton infliction of pain.

Petitioner has alleged facts which give rise to a cognizable cause of action and cannot be classified as frivolous and without merit.

## CONCLUSION, PRAYER, AND RELIEF

WHEREFORE, Petitioner prays that this Court grant relief and ORDER as per Petitioner's request in Petition's Memorandum in Support to the 2254 Federal Writ of Habeas Corpus page 67.

Respectfully Submitted,

*Yolanda Saldivar*

Yolanda Saldivar
TDC #733126
Mountain View Unit
2305 Ransom Rd.
Gatesville, Texas 76528

## CERTIFICATE OF SERVICE

I, Yolanda Saldivar, do hereby certify that the document was mailed by certified registered return receipt mail to the United States District Court for the Western District, Waco Division, 800 Franklin Ave., Room 380, Waco, Texas 76701-1934 on February 24 , 2011.

*Yolanda Saldivar*

Yolanda Saldivar
Petitioner

I, Yolanda Saldivar, do hereby certify that the document was mailed by certified registered return receipt mail to Mr. Rick Thaler, Director of the Texas Department of Criminal Justice Division, P.O. Box 99, Huntsville, Texas 77342 on February 24 , 2011.

*Yolanda Saldivar*

Yolanda Saldivar
(Petitioner